## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| TREJUAN JOHNSON, | CASE NO. 5:24-CV-01137-JPC |
| Petitioner, | JUDGE J. PHILIP CALABRESE |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| WARDEN TOM WATSON,[1] | **REPORT AND RECOMMENDATION** |
| Respondent. | |

### INTRODUCTION

Through counsel, Petitioner Trejuan Johnson, a prisoner in state custody, applied for a writ of habeas corpus under 28 U.S.C. § 2254. (ECF #1 at PageID 15). The District Court has jurisdiction under § 2254(a) and the matter is referred to me to prepare a Report and Recommendation. (Non-document entry of Aug. 14, 2024). On January 31, 2025, Respondent Tom Watson, as Warden of NCCC (hereinafter, the State), filed the Answer and Return of Writ,

---

[1] When Mr. Johnson filed his petition, he was incarcerated at the Trumbull Correctional Institution. (*See* ECF #1 at PageID 2). He is currently incarcerated at the North Central Correctional Complex (NCCC). *See Offender Details, A783270, Ohio Dept. Rehab. & Corr.,* http://appgateway.drc.ohio.gov/OffenderSearch/Search/Details/A783270 (last accessed June 16, 2025). A post-filing transfer does not moot the petition so long as there is an alternative respondent with custody inside the Northern District of Ohio. *See White v. Gilley,* No. 6:23-cv-110, 2023 WL 5987206, at *3 (E.D. Ky. Sept. 13, 2023). I take judicial notice that NCCC is located in Marion County, Ohio and Tom Watson is its Warden. *See North Central Correctional Complex, Ohio Dept. of Rehab. & Corr.,* http://drc.ohio.gov/about/facilities/north-central-correctional-complex (last accessed June 16, 2025). Because Marion County is within this judicial district, *see* 28 U.S.C. § 115(a)(2), I substitute Warden Watson as the proper respondent under Fed. R. Civ. P. 25.

with the state court record. (ECF #9). On May 6, 2025, Mr. Johnson submitted his Traverse (ECF #13). Mr. Johnson's petition is now decisional.

Mr. Johnson raises nine grounds for relief challenging his convictions for murder, felonious assault, and firearms offenses. For the reasons that follow, I recommend the District Court **DISMISS** Ground One, Ground Two, Ground Three, Subclaims Two, Five, and Six of Ground Four, and Ground Eight as procedurally defaulted; **DISMISS** Grounds Five, Six, Seven, and Nine as not cognizable; **DENY** Subclaims One, Three, and Four of Ground Four as meritless; and **DISMISS** the petition. I further recommend the District Court **DENY** Mr. Johnson a certificate of appealability (COA) on all grounds.

## Procedural History

### A.    State court factual findings

The Ohio Court of Appeals, Fifth Appellate District, set forth the facts on direct appeal. These factual findings are presumed correct unless Mr. Johnson rebuts this presumption by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1). The Fifth District determined:

> {¶2} On November 19, 2020, the Stark County Grand Jury issued an indictment charging Johnson, with two counts of murder, in violation of R.C. 2903.02(B)/(D), R.C. 2929.02(B), unclassified felonies, each with a firearm specification under R.C. 2941.145(A); one count of improperly discharging a firearm at or into a habitation or a school safety zone, in violation of R.C. 2923.161(A)(1)(C), a felony of the second degree; and seven counts of felonious assault, in violation of R.C. 2903.11(A)(2)/(D)(1)(a), felonies of the second degree. The first ten counts of the indictment each include a firearm specification under R.C. 2941.145(A). Finally, the indictment charged Johnson with one count of having a weapon while under disability, in violation of R.C. 2923.13(A)(3)/(B), a felony of the third degree.

> ### The shooting

> {¶3} In the early morning hours of July 22, 2020, Camri Harvey and Aaron Lucas were asleep in the bedroom of their residence located at 1645 Clarendon Avenue S.W., Canton, Ohio. Harvey's two children, D.P. and C.L. were also present. The newborn, C.L., slept with her and Lucas, while Harvey's older child, D.P., slept in

his own bedroom. Three of Lucas's children were also present at the residence. Child 1 was seven years old. Child 2 and Child 3 were nineteen-month-old twins. The three children were asleep on the living room couch.

{¶4} Sometime around 2:00 a.m., the couple was awakened by the sound of gunfire. The couple waited for the gunfire to stop. The pair then ran to check on the children. Lucas brought his three children to the bedroom. Child 1 was shaken but unhurt. Child 3 was crying and Child 2 was quiet. Lucas's demeanor changed when he realized that Child 3 was bleeding from the buttocks and Child 2 was not breathing.

{¶5} Child 2 had suffered three gunshot wounds. The children were taken to the hospital; tragically, Child 2 died from his gunshot wounds. Two bullets were recovered from Child 2's body. Child 3 was treated for a gunshot wound and released the following day.

### The investigation

{¶6} Security cameras were positioned around the outside of the home, and officers obtained a DVR with recordings of the security footage from the cameras. The footage shows three men approaching on foot, firing at the residence and running away. The faces of the three individuals cannot be seen on the footage.

{¶7} Among the evidence collected from the home were ten .45 caliber spent casings, thirteen 9mm spent casings, and projectiles found inside and outside of the home. Photographs depicting the damage to the home and numerous ballistics impact marks throughout the home were also obtained during the investigation.

{¶8} Larry Mackey of the Stark County Crime Laboratory testified as an expert in the field of firearms identification. Mackey examined the ten spent .45 caliber cartridge cases recovered from the scene, and determined that all ten were fired from the same handgun. Mackey also compared the thirteen 9mm cartridge cases recovered from the scene. Mackey concluded that four of the thirteen bullets had been fired from one gun. The remaining nine 9mm cartridges had also been fired from one gun, although not the same gun as the other four 9mm cartridges. In all, three guns were used in the shooting: one fired all ten of the .45 caliber bullets, one fired four 9mm bullets, and one fired nine 9mm bullets. Mackey's analysis of the two 9mm bullets recovered from Child 2's body was inconclusive as to which gun fired the fatal shots.

{¶9} Investigating officers canvased the neighborhood surrounding the home and identified several residences with doorbell cameras or other security cameras. Detective Michael Talkington of the Canton Police Department created a compilation of videos collected from the various cameras in the vicinity. One video camera directly across the street showed the front of the home at 1645 Clarendon. Video recorded from a camera at 1624 Frederick shows the two suspect vehicles just after the shooting traveling north on Frederick Avenue. Videos from 1508 Clarendon and 2216 15th Street, SW also show the two vehicles on 15th Street

3

traveling eastbound. Investigators also obtained video from the Fulton and Blake areas that show the ramp that leads from Route 62 to I-77.

{¶10} Video taken from the camera at 15th and Harrison allowed investigators to observe and identify the two suspect vehicles while they were headed eastbound and stopped at the traffic light at that intersection. One of the vehicles is a silver Chrysler 200 with an issue with the front passenger-side tire. The other vehicle is a white Dodge Charger with black sidemirrors and black metallic rims on the tires.

{¶11} Investigating officers posted an internal be-on-the-lookout bulletin for the two suspect vehicles. A few days after the incident, police publicly released the video from the security camera of the residence, showing the individuals, on foot, firing shots at the house and running off.

{¶12} Among the leads on potential suspects, police received the names of "Jerk" and "J. Milli." "Jerk" is the known alias of Jonas Hudson, an individual with whom Canton police are familiar based on past investigations. Jerk resides in the Canton area but is originally from the Chicago area. Investigators were able to identify "J. Milli" as Jamal Smith and tracked him down in the Chicago area. Both Jerk and J. Milli are known affiliates of a street gang, the "Black Gangster Disciples."

{¶13} Detective Michael Volpe from the Canton Police Department testified that Aaron Lucas had been involved in a shooting incident in August 2021 and was deceased as a result of that incident. Detective Volpe testified that Lucas had told him that Lucas had been involved in at least six robberies of street gang members and drug traffickers in Canton. One of those robberies involved Lajentrius [sic.] Johnson, the brother of the defendant-appellant. Marijuana, money, and possibly other controlled substances were taken during the robbery.

**The suspect vehicles**

{¶14} Four days after the shooting, officers located the Chrysler 200 that had been depicted in the surveillance video. The car was being driven by Ki'Jier Jenkins. Jenkins informed the officers that he had gotten the car from his cousin, Davai Woodson. The vehicle, which had West Virginia license plates, was registered to Marcus Gibbs. Further investigation revealed that Woodson had obtained the car from Gibbs via a "crack rental." The car had a spare tire on the right front side of the car. The car also had damage to the front bumper.

{¶15} On July 26, 2020, Detective Volpe assisted in the execution of a search warrant for the residence of Johnson's sister, Sabria. Johnson was outside the home. Johnson's vehicle was impounded at that time. The car, a white Dodge Charger, had black mirrors and silver-gray rims. The car also had two distinctive rust marks on the driver side rear of the car. The license plate number for the vehicle was also identified. The video from the morning of the shooting, however, showed a white Charger with black or black metallic rims.

{¶16} Detective Volpe asked Johnson if he knew the father of the deceased nineteen-month-old baby. Johnson responded the father was an individual who had robbed Johnson's brother.

{¶17} The discrepancy with the rims on the white Dodge Charger prompted investigators to run the license plate number through the license plate reader ("LPR"). The LPR takes video and records license plate numbers of vehicles that pass by cameras in the LPR system. The search yielded several results, including a video and picture recorded July 17, 2020. The video showed that Johnson's vehicle, 5 days before the shooting, had black rims on it.

### Facebook

{¶18} Detective Volpe received business records for the Facebook page or account associated with Johnson. Records from Johnson's Facebook account contained a photograph of his car. The picture showed a white Dodge Charger with black side mirrors, black rims, and the same license plate number as Johnson's impounded car.

{¶19} Johnson's Facebook page further had a group photograph, which included Johnson, Jerk (Jonas Hudson), and Davai Woodson.

### Whereabouts of Johnson before the shooting

{¶20} Joy Hastings has been living in Florida since 2019. However, she has known Johnson and Davai Woodson since high school. Hastings testified that Johnson and Woodson had been friends since high school.

{¶21} On July 21, 2020, Woodson asked Hastings to come to Ohio. Woodson paid for her airline ticket. Woodson was driving a silver car with a problem in the front end. Hastings was drinking and smoking marijuana throughout the evening.

{¶22} At some point, Hastings returned to her father's house to shower and change clothes. Hastings then went to a bar where she was contacted by Woodson to come and meet him at "Legit's" house. Hastings testified that "Legit" is related to Johnson. When she arrived, Woodson, "Legit" and Jerk were present. Hastings told Detective Volpe that she had also seen Johnson there at that time, but now she was not sure. Hastings left and eventually returned to her father's home around 2:00 am.

{¶23} Hastings testified that Detective Volpe came to Florida to interview her on August 13, 2020. She claimed the detective threatened her that she could be charged criminally if she did not tell the truth. Further, Detective Volpe mentioned to her that there was a $15,000 reward for a conviction in this case. However, Hastings testified that she was not here for the reward money. Further, she testified she told Detective Volpe the truth.

## Johnson is interviewed by the police

{¶24} Johnson was interviewed by Detective Volpe and special agent Mark McMurphy on August 7, 2020. Johnson again told the detective that Lucas had robbed his brother. Johnson admitted that he knew Jonas Hudson as "Jerk." Johnson denied that he knew "J. Milli." Johnson told the officers that on July 22, 2020 he had been at his brother Lagentrius Johnson's house all day and night. Lagentrius Johnson lived in the Bexley Townhome apartments near 37th Street and Martindale Road, Canton, Ohio.

{¶25} The most direct route to get from the Bexley apartments to the home where the shooting occurred at 1645 Clarendon, would be to take Martindale Road southbound to 30th Street. Then, traveling westbound on 30th Street, turn southbound on Market Avenue, and then merge on to Route 62 westbound. From there, one would head south on I-77 to Route 30, take Route 30 west to the Harrison Avenue exit, and head south on Harrison to its intersection with 15th Street. It is here, at the intersection of 15th and Harrison that video shows the Dodge Charger and the Chrysler 200 stopped at the traffic light the morning of the shooting.

## Cell phone records

{¶26} Upon learning the phone numbers for Davai Woodson and "Jerk" [Jonas Hudson], Detective Volpe obtained search warrants for their phone records. Detective Volpe downloaded the records for Davai's phone number, sent electronically by the phone company in response to the warrant, and stored the records on a disc. He did the same with the records received for Jerk's phone number. Detective Volpe provided these records to Jacob Kunkle, a special agent with the Federal Bureau of Investigation supervising the Canton and Mansfield offices, for analysis.

{¶27} Agent Jacob Kunkle is part of the Cellular Analysis Survey Team, which is comprised of agents specializing in cellular phone record analysis. The analysis involves looking at cellular phone records and determining the general areas where the phones were located when communications were made or received. The phone records are referred to as a "Call Detail Record." These are records that are kept by the particular phone company in the normal course of business to document communications of phones on the network. The information in these records includes the numbers involved in the communications, the date, time, duration of communications; and the cellphone tower, and in some cases, the particular side of a tower used by the phone. Agent Kunkle uses this information in his analysis to ascertain a general idea of where the phone was on the map during a communication.

{¶28} Without objection, the trial court certified Agent Kunkle as an expert in historical cell phone records analysis.

6

{¶29} Agent Kunkle analyzed records from Verizon and Sprint within a specific time frame of the evening of July 21 to the early morning of July 22, 2020. The Verizon phone, number 330-605-xxxx belonged to Davai. The Sprint phone, 708-359-xxxx, belonged to Jerk [Jonas Hudson]. Agent Kunkle identified and mapped the towers used to make or receive calls from these two phones during the specified time period. He created a report, based on his analysis, drawing conclusions about the location of the phones.

{¶30} Agent Kunkle's report documented the cell phone activity of the phone belonging to Jerk [Jonas Hudson] between 11:19 p.m. on July 21, 2020, and 3:03 a.m. on July 22, 2020. Communications taking place at 11:19 p.m. and then 11:25 p.m. used different towers, which indicates the phone moved from an area to the southwest of Massillon toward the Hills and Dales or Avondale area of Canton. At 11:28 p.m., the phone used another tower, indicating the phone had moved from west to east. The phone used another tower, at 11:42 p.m. indicating the phone had moved again, this time north, in the direction of the Bexley apartments where Lagentrius Johnson lived. The next activity on the phone occurred at 3:03 a.m. when it used a tower near the Bexley apartments.

{¶31} Agent Kunkle's report initially places the phone belonging to Davai in the Massillon area at 10:20 p.m. Phone activity at 10:56 p.m. show movement toward the Canton area. Between 10:56 and 11:51 p.m. the phone utilizes different towers for communications, reflecting the phone moved north, in the vicinity of the Bexley apartments. From 12:00 a.m. to 12:37 a.m., the phone had several communications using one tower, but two separate sides of that tower. The phone used that tower again at 1:35 and 1:36 a.m. Again, at 2:46 and 2:47 a.m., the phone used that same tower in the northeast part of Canton, near the Bexley apartments.

### Johnson's cellmates testify at trial

{¶32} Detective Volpe received information that Lamar Mitchell, an inmate at the Lorain Correctional Institution ["LCI"] had information concerning the shooting. Detective Volpe interviewed Mitchell on August 25, 2020 and again the second week of September 2020 at the prison.

{¶33} On September 17, 2020, Detective Volpe again traveled to LCI having received information that a second inmate, Richard Bennett, also claimed to have information regarding the shooting.

### *Lamar Mitchell*

{¶34} At trial, Mitchell testified that he arrived at LCI on August 11, 2020. At that time due to the Covid-19 emergency, Mitchell was placed in quarantine with one cellmate, Johnson.

{¶35} During conversations with Johnson, Mitchell testified that Johnson told him that his brother had been robbed of "some weed . . . Money . . . [and] a little bit of heroin." Mitchell testified that Johnson told him that Johnson, "J. Milli, some guy from Chicago, somebody named 'Jerky'" and "Davai" decided to rob the home of the person who had robbed Johnson's brother. The individuals were at Legit's house prior to the shooting.

{¶36} Mitchell testified that Johnson told him the group used two cars, a "crack rental" and a Dodge Charger. The cars were parked away from the house. Mitchell testified that at first, Johnson told Davai to go up to the house; however, Davai got scared so all of the individuals "went around the side of the house and opened fire on the house." All of the individuals had guns. After the shooting, the individuals returned to Legit's apartment. Johnson further told Mitchell that his car had dark rims; however, after the shooting Johnson changed them for chrome rims.

{¶37} Mitchell reported this information. He eventually spoke with Detective Volpe. Mitchell testified that he was released from prison early after he agreed to testify against Johnson. Mitchell testified that although there is a code that one does not snitch, "when there's a child involved all that go out the window with me."

### Richard Bennett

{¶38} Bennett shared a cell with Johnson for about five days while they were housed at LCI. Bennett testified that Johnson, while in the cell, repeatedly put a towel across his head and, while wearing his facemask, would ask Bennett whether he could identify him. Johnson told Richard he was being investigated for murder and shared details of the incident. Johnson told Bennett that he was upset that someone had stolen $11,000.00 and some marijuana from him, and so he went and shot the house up with two individuals from Chicago. Johnson described the two men as "some bad boys," and stated that they were involved in the Black Gangster Disciples. Johnson also told Richard how they drove near the house and parked down on the corner and took the license plates off. Then the three of them walked to the house. Johnson told Richard that he had been wearing a black hoodie and a face mask. Bennett further testified that Johnson told him that the police had the car. Bennett was permitted to testify over objection that Johnson had told Bennett that a few years ago Johnson had been shot in the leg. Bennett called his wife to do a three-way telephone call to the Canton Police Department to report the information.

{¶39} The defense presented no witnesses.

### Verdict and sentence

{¶40} Following deliberations, the jury returned verdicts finding Johnson guilty on counts one through ten of the indictment, and guilty of each of the ten attendant firearm specifications.

(ECF #9-1 at PageID 299-310 (cleaned up); *see also State v. Johnson*, 203 N.E.3d 78, 86-92 (Ohio Ct.

App. 2022), *delayed appeal not allowed*, 211 N.E.3d 1210 (Ohio 2023) (table)).

**B.      Direct appeal**

On October 19, 2021, through new counsel, Mr. Johnson timely appealed his convictions

to the Fifth District. (ECF #9-1 at PageID 179). There, he raised nine assignments of error:

1.    The trial court failed to meet the requirements of a Crim. R. 43 waiver, resulting in a waiver of presence which was not knowingly, intelligently, and voluntarily made;

2.    The trial court erred by forcing Mr. Johnson to proceed to trial with anonymous jurors;

3.    The State engaged in prosecutorial misconduct when it instructed the jury that its obligation is to find him guilty even if it finds he did not have a purpose to kill;

4.    Mr. Johnson's trial counsel was ineffective because counsel failed to (i) strike biased jurors, (ii) raise a *Daubert* challenge to scientific evidence, (iii) object to the admission of unauthenticated cell-phone records, (iv) object to prejudicial testimony alleging gang activity, (v) request a curative instruction about that testimony, and (vi) object to the prosecutor asking leading questions during direct examination;

5.    The trial court committed plain error by admitting testimony about the content of unauthenticated records;

6.    The trial court erred by admitting over objection irrelevant and prejudicial testimony about Mr. Johnson's involvement in an unrelated shooting;

7.    Mr. Johnson's convictions are against the manifest weight of the evidence;

8.    Mr. Johnson's convictions are not supported by sufficient evidence; and

9.    Cumulative error.

(*See id.* at PageID 183-85) (cleaned up). On December 5, 2022, the Fifth District affirmed. (*See id.*

at PageID 361; *see also Johnson*, 203 N.E.3d 78).

On January 23, 2023, through new counsel, Mr. Johnson sought permission to file a delayed appeal to the Supreme Court of Ohio. (ECF #9-1 at PageID 367). On March 14, 2023, the Supreme Court of Ohio allowed the delayed filing. (*Id.* at PageID 377). Mr. Johnson advanced eight propositions of law:

1.   A criminal defendant is entitled to be present for substantive aspects of voir dire;

2.   A trial court must inquire into the bias of a juror or move to strike, to ensure that the juror is not empaneled resulting in a biased jury;

3.   Trial counsel is ineffective where defense fails to object to highly prejudicial testimony against a defendant's alleged gang activity;

4.   A trial court must prohibit admission of irrelevant prejudicial testimony of a criminal defendant's involvement in a prior shooting;

5.   It is improper for a trial court to withhold the identity of jurors as to their names and addresses where nondisclosure is not shown to be necessary;

6.   Admission of unauthenticated records violates a criminal defendant's Confrontation Clause Rights under the Sixth Amendment to the United States Constitution and violates the Ohio Rules of Evidence;

7.   A criminal conviction cannot stand where the manifest weight of the evidence does not support such a conviction; and

8.   A criminal defendant is denied a fair trial in violation of the U.S. and Ohio Constitutions as a result of the cumulative effect of errors.

(ECF #9-1 at PageID 380). On July 5, 2023, the Supreme Court of Ohio declined to hear Mr. Johnson's appeal. (*Id.* at PageID 417; *see also Johnson*, 211 N.E.3d 1210).

### FEDERAL HABEAS PETITION

Before this Court, Mr. Johnson raises nine grounds for relief:

**GROUND ONE:** The trial court failed to meet the requirements of a Crim. R. 43 waiver, resulting in a waiver of presence which was not knowingly, intelligently, and voluntarily made in violation of the Sixth Amendment.

10

**GROUND TWO:** The trial court erred by forcing Mr. Johnson to proceed to trial with anonymous jurors.

**GROUND THREE:** The state engaged in prosecutorial misconduct violating Mr. Johnson's rights to a fair trial and the presumption of innocence when it instructed the jury that "its obligation is to find him guilty even if it finds he didn't have purpose to kill."

**GROUND FOUR:** The individual and cumulative effect of defense counsel's performance was so deficient that Mr. Johnson was denied the effective assistance of counsel in violation of his rights guaranteed under the Sixth Amendment to the United States Constitution.

**GROUND FIVE:** The appellate court improperly concluded that the trial court did not err in permitting the admission of testimony as to the content of unauthenticated records, that constitutes plain error in violation of Mr. Johnson's Due Process and Confrontations rights guaranteed under the Fifth and Sixth Amendment of the U.S. Constitution.

**GROUND SIX:** The appellate court improperly concluded that the trial court did not err in permitting introduction of overly prejudicial evidence of Mr. Johnson's involvement in another shooting.

**GROUND SEVEN:** The appellate court improperly concluded that Mr. Johnson's convictions were not against the manifest weight of the evidence.

**GROUND EIGHT:** The appellate court improperly concluded that the evidence presented at trial was sufficient to sustain convictions against Mr. Johnson.

**GROUND NINE:** The appellate court improperly found that the cumulative effect of multiple errors deprived Mr. Johnson of his constitutional right to a fair trial under the United States Constitution.

(ECF #1 at PageID 6, 8-9, 11; ECF #1-1 at PageID 17).

## STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs Mr.

Johnson's habeas petition. *Lindh v. Murphy*, 521 U.S. 320, 336 (1997). AEDPA recognizes that

"[s]tate courts are adequate forums for the vindication of federal rights" so AEDPA acts as a

"formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in

11

state court." *Burt v. Titlow*, 571 U.S. 12, 19 (2013). AEDPA "dictates a highly deferential standard for evaluating state-court rulings which demands that state-court decisions be given the benefit of the doubt." *Bell v. Cone*, 543 U.S. 447, 455 (2005) (citation and quotation omitted). Habeas courts review the last-explained state-court judgment on the federal claim at issue. *Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991).

Accordingly, habeas relief cannot be granted for a person in custody pursuant to a state conviction unless the adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceedings." 28 U.S.C. § 2254(d).

For the purposes of § 2254(d)(1), "clearly established Federal law" means "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). It includes "the holdings, as opposed to dicta, of [Supreme Court] decisions." *Williams v. Taylor*, 529 U.S. 362, 412 (2000).

A state-court decision is "contrary" to Supreme Court precedent if the state court arrives at a conclusion opposite that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has decided on a set of materially indistinguishable facts. *Id.* at 405. The word "contrary" means "diametrically different, opposite in character or nature, or mutually opposed." *Id.* A state court does not act contrary to Supreme Court precedent when the precedent of the Supreme Court is ambiguous or nonexistent. *See Mitchell v. Esparza*, 540 U.S. 12, 17 (2003) (per curiam).

A state-court decision involves an "unreasonable application" of Supreme Court precedent if (1) the state court identifies the correct governing legal rule from the Supreme Court's cases but unreasonably applies it to the facts of the state prisoner's case or (2) the state court either unreasonably extends a legal principle from the Supreme Court's precedent to a new context where it should not be applied or unreasonably refuses to extend that principle in a new context where it should apply. *Williams*, 529 U.S. at 407. A state-court decision must be "objectively unreasonable" to have unreasonably applied Supreme Court precedent which requires more than the decision being "erroneous" or "incorrect." *See id*. at 409-11. "It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

Under § 2254(d)(2), a state court's factual determinations stand unless they too are objectively unreasonable in light of the evidence presented in state court. *See Harrington*, 562 U.S. at 100. The Supreme Court has repeatedly emphasized "a state court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion." *Burt*, 571 U.S. at 18. Under AEDPA, "a determination of a factual issue made by a state court shall be presumed to be correct" unless the petitioner offers clear and convincing evidence to the contrary. *See* 28 U.S.C. § 2554(e)(1).

Comity principles also require federal courts to defer to a state court's judgment on issues of state substantive and procedural law. *Murray v. Carrier*, 477 U.S. 478, 491 (1986); *Engle v. Isaac*, 456 U.S. 107, 128-29 (1982). Federal courts must accept a state court's interpretation of its statutes and rules of practice. *Duffel v. Dutton*, 785 F.2d 131, 133 (6th Cir. 1986).

The standard is intended to be "difficult to meet" and reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal. *Harrington*, 562 U.S. at 102-03; *see also Brown v. Davenport*, 596 U.S. 118, 133 (2022) (describing habeas as an "extraordinary remedy, reserved for only extreme malfunctions in the state criminal justice system and different in kind from providing relief on direct appeal") (cleaned up). To obtain "habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Harrington*, 562 U.S. at 103.

### PROCEDURAL BARRIERS TO FEDERAL HABEAS REVIEW

Before a federal court may review a petitioner's habeas claims on the merits, the petitioner must overcome several procedural barriers that limit a petitioner's access to review on the merits of a constitutional claim. *Daniels v. United States*, 532 U.S. 374, 381 (2001). Put simply, federal habeas review is limited to federal claims that a state court decided on the merits. Claims not evaluated on the merits, either because they were never presented to the state courts (*i.e.*, they are unexhausted) or because they were not properly presented to the state courts (*i.e.*, they are procedurally defaulted), are generally not reviewable by a federal habeas court. *See Bonnell v. Mitchel*, 301 F.Supp.2d 698, 722 (N.D. Ohio Feb. 4, 2004).

**State-law Claims Not Cognizable on Federal Habeas Review**. Federal habeas review is available only for claims that "challenge the legality of [the petitioner's] custody" based on a "violation of the Constitution or law or treaties of the United States." 28 U.S.C. § 2254(a). Put another way, "[t]he writ of habeas corpus is not available to remedy errors of only state law." *Smith*

14

*v. Morgan*, 371 F.App'x 575, 582 (6th Cir. 2010); *see also Norris v. Schotten*, 146 F.3d 314, 328 (6th Cir. 1998) ("A claim based solely on an error of state law is not redressable through the federal habeas process."); *see also Rivera v. Illinois*, 556 U.S. 148, 158 (2009) ("The Due Process Clause . . . safeguards not the meticulous observance of state procedural prescriptions, but the fundamental elements of fairness in a criminal trial.") (quotation omitted); *see also Engle*, 456 U.S. at 121 n.21 ("We have long recognized that a 'mere error of state law' is not a denial of due process.") (citation omitted).

Federal habeas review is generally not available to decide whether a state court complied with state law or state procedural requirements. *Oviedo v. Jago*, 809 F.2d 326, 328 (6th Cir. 1987). A federal habeas court "does not function as another state appellate court to review a state court's interpretation of its own law or procedure." *Id.* Rather, a federal habeas court is bound by "[a] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005).

A petitioner cannot justify habeas relief by simply asserting that a state-law error violates the federal constitution. *See Wilson v. Corcoran*, 562 U.S. 1, 5 (2010). But habeas relief may be available if an error of state law made the criminal process "fundamentally unfair." *Williams v. Anderson*, 460 F.3d 789, 816 (6th Cir. 2006). "[T]he category of infractions that violate fundamental fairness is defined very narrowly," and includes only state rulings that "offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Bey v. Bagley*, 500 F.3d 514, 521 (6th Cir. 2007) (cleaned up). The habeas petitioner must show "the principle of procedure violated by the rule (and allegedly required by due process)" is fundamental. *Id.*

**Procedural Default.** A federal habeas court may not review claims that were procedurally defaulted under state law. *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991). There are two avenues by which a petitioner may procedurally default a claim. *Williams*, 460 F.3d at 806. One way a procedural default occurs is if a petitioner "fails to comply with state procedural rules in presenting his claim to the appropriate state court." *Id.* To determine whether that failure bars review of a habeas claim, courts in the Sixth Circuit ask four questions: (1) whether there is a state procedural rule applicable to petitioner's claim and whether petitioner failed to meet that rule; (2) whether the state court enforced the procedural rule; (3) whether the procedural rule is an adequate and independent state ground on which the state can bar review of the federal constitutional claim; and (4) whether the petitioner can show cause for his failure to follow the rule and that he was actually prejudiced by the alleged constitutional error. *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986).

The other way a claim can be procedurally defaulted is if a petitioner does not raise it in state court and pursue it through the state's "ordinary appellate review procedures." *Williams*, 460 F.3d at 806 (citing *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999)). To have a habeas claim considered on the merits, a petitioner must present that federal claim at "each and every level" of the state courts. *See Baston v. Bagley*, 282 F.Supp.2d 655, 661 (N.D. Ohio 2003). If a petitioner did not first raise his federal habeas claim before the state courts and state law would no longer allow the petitioner to raise the claim in state court, the claim is procedurally defaulted. *Williams*, 460 F.3d at 806.

**Excusing a Procedural Default.** A procedural default is not the end of a habeas claim. A petitioner can overcome a procedural bar by showing either (1) cause for the default and actual

prejudice because of the alleged violation of federal law or (2) not considering the claims will result in a fundamental miscarriage of justice. *See Coleman*, 501 U.S. at 749. Success here does not entitle a petitioner to habeas relief; it only allows a federal court to consider the merits of a claim (subject to the standard of review above) when the claim would otherwise be procedurally defaulted. *See Martinez v. Ryan*, 566 U.S. 1, 10 (2012); *see also Coleman*, 501 U.S. at 750.

Habeas petitioners cannot rely on conclusory assertions of cause and prejudice to overcome procedural default. Rather, "the existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray*, 477 U.S. at 488; *see also Wogenstahl v. Mitchell*, 668 F.3d 307, 321 (6th Cir. 2012). To show prejudice sufficient to overcome procedural default, a petitioner must show more than mere errors in the state trial creating a possibility of prejudice. *Murray*, 477 U.S. at 494. Rather, the petitioner must show the alleged errors worked to the petitioner's actual and substantial disadvantage, infecting the entire trial with error of constitutional dimensions. *Id.* There is no prejudice where the petitioner does not show a reasonable probability that the result of the proceeding would have been different. *Ambrose v. Booker*, 801 F.3d 567, 577-78 (6th Cir. 2015).

Alternatively, a petitioner may overcome procedural default by showing that a fundamental miscarriage of justice will occur if the claims are not considered. *Coleman*, 501 U.S. at 750. A fundamental miscarriage of justice occurs in the "extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray*, 477 U.S. at 495-96. Actual innocence means "factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998). A valid actual innocence claim must be

17

supported by new, reliable evidence that was not presented at trial and is "so strong a court cannot have confidence in the outcome of the petitioner's trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995). Such evidence can include exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence. *Id*. But this evidence "must show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Id*. at 327

### ANALYSIS

The State argues Mr. Johnson procedurally defaulted Grounds One and Two by not objecting to those errors at trial (ECF #9 at PageID 78) and he procedurally defaulted Ground Three, parts of Ground Four, and Ground Eight by not raising them before the Supreme Court of Ohio (*Id*. at PageID 93-94, 121-22). The State also argues Grounds Five, Six, Seven, and Nine are not cognizable on habeas review. (*Id*. at PageID 105-06, 113, 116, 123-24). The State further argues the grounds for relief each lack merit. Mr. Johnson largely does not respond to the State's procedural defenses in his Traverse and focuses on the merits of the claims. (*See* ECF #13).

**A.    Procedural default**

    **1.    Grounds One and Two, which relate to voir dire, are procedurally defaulted under Ohio's contemporaneous-objection rule because Mr. Johnson did not object during the voir dire process.**

In Ground One, Mr. Johnson argues he was denied his right to be physically present during voir dire and his waiver of physical presence during voir dire was deficient. (ECF #1-2 at PageID 20-22). In Ground Two, Mr. Johnson argues he was denied the right to have a public jury. (*Id*. at PageID 22-23). The State responds that Mr. Johnson procedurally defaulted Grounds One and Two because he did not object at trial either to his absence during certain stages of voir dire or to the jurors' identities being kept confidential. (ECF #9 at PageID 78). I agree with the State that Grounds One and Two are procedurally defaulted.

As discussed above, a petitioner can procedurally default a claim (barring habeas review) if a petitioner "fails to comply with state procedural rules in presenting his claim to the appropriate state court." *Williams*, 460 F.3d at 806. Under the four-pronged analysis to determine whether a state procedural rule bars review of a habeas claim, the court asks: (1) whether there is a state procedural rule applicable to petitioner's claim and whether petitioner disregarded that rule; (2) whether the state court enforced the procedural rule; (3) whether the procedural rule is an adequate and independent state ground on which the state can foreclose review of the federal constitutional claim; and (4) whether the petitioner can show cause for his failure to follow the rule and that he was actually prejudiced by the alleged constitutional error. *Maupin*, 785 F.2d at 138. All four factors indicate Mr. Johnson procedurally defaulted Grounds One and Two.

First, Ohio employs a contemporaneous-objection rule that prohibits later review of a claim when no objection was made during trial proceedings absent a showing of cause and prejudice. *See State v. Murphy*, 747 N.E.2d 765, 788-89 (Ohio 2001). This rule applies to voir dire and a party's failure to object to allegedly improper conduct during voir dire bars future challenges to that conduct. *See Davis v. Bobby*, No. 2:10-CV-107, 2015 WL 5734458, at *33 (S.D. Ohio Sept. 29, 2015) (collecting Ohio cases). Mr. Johnson did not object when the trial court used the jury room to voir dire the prospective jurors who indicated having knowledge about the case. (*See* ECF #9-2 at PageID 468-70). The court indicated the separate room was necessary under the court's COVID-19 protocol; otherwise, the voir dire would occur at sidebar. (*Id.* at PageID 472). Mr. Johnson consented to using the separate room and his attorney could leave to speak with him as needed. (*Id.* at PageID 472-73). For Ground Two, the trial court withheld the prospective jurors'

19

names and address from the information sheets provided to counsel to protect their privacy and Mr. Johnson made no objection. (*See id.* at PageID 447-48).

Second, Ohio courts enforce the contemporaneous-objection rule by analyzing a waived error under a plain-error standard of review. *See Murphy*, 747 N.E.2d at 789 (quoting Ohio Crim. R. 52(B)). The Fifth District did exactly that for Ground One. (*See* ECF #9-1 at PageID 318-19; *see also Johnson*, 203 N.E.3d at 96). For Ground Two, the Fifth District applied both a plain-error and a structural-error standard of review. (*See* ECF #9-1 at PageID 320-24; *see also Johnson*, 203 N.E.3d at 96-98).

Third, the Sixth Circuit has repeatedly held Ohio's contemporaneous-objection rule is an independent and adequate state ground to foreclose review. *See Hand v. Houk*, 871 F.3d 390, 417 (6th Cir. 2017); *see also Davis*, 2015 WL 5734458, at *33 (applying rule to bar habeas review of five voir-dire claims that were not raised to the trial court).

Fourth, Mr. Johnson advances "counsel's failure to object to his absence excluded Johnson's ability to participate in critical aspects of voir dire" as cause for the failure to object. (ECF #13 at PageID 1105). Mr. Johnson offers no explanation of how the failure to object constituted ineffective assistance and he does not argue this issue in his six ineffective-assistance claims in Ground Four. (*See* ECF 1-2 at PageID 25-34; ECF #13 at PageID 1109-14). Similarly, Mr. Johnson asserts without explanation that his waiver of physical presence during parts of voir dire was not knowing, voluntary, or intelligently made. (ECF #1-2 at PageID 22). Mr. Johnson does not mention cause for the failure to object to the anonymous jury in his Petition or his Traverse, instead opting to argue the merits. (*See* ECF #1-2 at PageID 22-24; ECF #13 at PageID 1105-09).

Ground Two similarly does not appear in his ineffective-assistance claims. (*See* ECF 1-2 at PageID 25-34; ECF #13 at PageID 1109-14).

A habeas petitioner cannot rest on "conclusory allegations of ineffective assistance" to succeed on the fourth prong of the *Maupin* test. *See Wogenstahl*, 668 F.3d at 335. That is doubly so here because Mr. Johnson was represented by counsel throughout this proceeding (*see* ECF #1 at PageID 16), so his habeas petition is not entitled to liberal construction. *See Johnson v. Wainwright*, No. 1:17-cv-2143, 2019 WL 7284990, at *10 (N.D. Ohio Aug. 8, 2019) (collecting cases), *report and recommendation adopted*, 2019 WL 5616318 (N.D. Ohio Oct. 31, 2019). As that court observed regarding a similarly limited argument by counsel:

> The court is not obligated to search Johnson's petition, supporting memorandum and traverse in search of a cause and prejudice argument. Indeed, Johnson's traverse acknowledges that procedural default can be overcome by showing cause and prejudice but then offers no argument to show that he had cause to excuse the default of his Supreme Court appeal.

*Id.* Under the same logic, this Court need not examine the filings and the record to determine independently whether his conclusory arguments of cause have support.

That said, after examining the filings and record, I conclude Mr. Johnson's arguments lack support. An ineffective-assistance claim cannot serve as cause to excuse a procedural default when that claim is itself procedurally defaulted. *Murray*, 477 U.S. at 488-89. A claim can be procedurally defaulted if it is not presented at "each and every level" of the state courts. *See Baston*, 282 F.Supp.2d at 661. Mr. Johnson procedurally defaulted any claim that his trial counsel was ineffective for not objecting to the separate voir dire or the anonymous jury because he did not raise those issues at any level of the state courts.

Mr. Johnson argued ineffective assistance in his direct appeal and mentioned under that claim that his "trial counsel did not protect Appellant Johnson's right to be present for full voir dire." (ECF #9-1 at PageID 201). But he did not include that failure among his six claims of ineffective assistance at the Fifth District (*see id.* at PageID 201-15) or the one claim at the Supreme Court of Ohio (*id.* at PageID 387-89). Mr. Johnson also did not mention the failure to object to the anonymous jury in his ineffective-assistance argument. (*See id.*). Mr. Johnson cannot now argue his appellate counsel was ineffective for not raising these two errors because Mr. Johnson procedurally defaulted that argument by never raising such a claim.

I also conclude the record does not support Mr. Johnson's allegation that his waiver was unknowing, involuntary, or not intelligently made. The Fifth District found on direct appeal that:

> During voir dire, Johnson was physically present when the trial judge stated she would privately question potential jurors about pretrial publicity in a room right off of the courtroom, with the attorneys and the court reporter present. The court noted on the record that the separate voir dire took place in the jury deliberation room, as opposed to a sidebar at the bench in the courtroom, due to "masking requirements and social distancing restrictions in effect because of the COVID pandemic." The court inquired as to whether Johnson had any objection to conducting voir dire in this fashion. Defense counsel responded:
>
>> Your Honor, I had an opportunity to speak with [Johnson] in private, I discussed with him that there were positive answers to the questionnaire about publicity.
>>
>> I discussed with him that typically we would handle those matters at a sidebar and typically he would be in the courtroom when that's going on, even though we were doing it away from the defense table.
>>
>> I said based upon the COVID social distancing we needed to do it in a room in private where he could not be with me. He gave me his consent that I could go forward and question these jurors while he waits in another area.
>
> The state further added,

22

> [I]f this were not COVID and there was not social distancing, this
> would take place at the bench.
>
> The Defendant would still not be a participant in the sidebars because
> he would be seated at counsel table some fifteen to twenty feet away
> from where the attorneys were discussing these matters with the judge
> and the potential jurors.
>
> But in this case, because of the social distancing requirements, we've
> chosen to do it this way and [defense counsel] has indicated his
> client's consent to this.
>
> And I want the record to reflect that if at any time during this [defense
> counsel] needs to discuss one of these jurors with his client he's going
> to have the ability to do that because he's just down the hall from us
> behind a closed door in the company of a couple deputies.

(ECF #9-1 at PageID 316-18; *see also Johnson*, 203 N.E.3d at 95-96) (citations omitted, alterations in

original). Under AEDPA, these factual findings are presumed correct unless Mr. Johnson shows

otherwise by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1). Mr. Johnson has not

contested the Fifth District's factual findings that he consented to the separate voir dire room after

discussion with his counsel and the state-court record supports such a finding. (*See* ECF #9-2 at

PageID 472-73).

In sum, Mr. Johnson does not show cause for not objecting at trial to the separate room for

voir dire or to the anonymous jury and all four *Maupin* prongs indicate Mr. Johnson procedurally

defaulted these claims. I thus recommend the District Court **DISMISS** Grounds One and Two as

procedurally defaulted.

### 2. Ground Three is procedurally defaulted because Mr. Johnson did not raise the claim before the Supreme Court of Ohio.

In Ground Three, Mr. Johnson argues the State committed prosecutorial misconduct when

the prosecutor commented during closing argument about the applicable mental state required

and the burden of proof for that element. (ECF #1-2 at PageID 24-25). The State responds the

23

claim is procedurally defaulted because Mr. Johnson did not present it to the Supreme Court of Ohio. (ECF #9 at PageID 93).

Habeas petitioners must present their federal claim at "each and every level" of the state courts before a federal habeas court may consider the merits of those claims. *See Baston*, 282 F.Supp.2d at 661. In Ohio, this includes presenting the claim at the trial court, the Court of Appeals, and the Supreme Court of Ohio. *Id.*; *see also Leroy v. Marshall*, 757 F.2d 94 (6th Cir. 1985) (holding habeas review barred by default where petitioner presented claim on direct review to the Court of Appeals, but not to the Supreme Court of Ohio). Mr. Johnson did not raise his prosecutorial-misconduct claim in his appeal to the Supreme Court of Ohio. (ECF #9-1 at PageID 380, 385-94). Thus, the claim is procedurally defaulted.

Mr. Johnson does not advance cause and prejudice to excuse this default, nor does he argue he is actually innocent. Mr. Johnson cannot rely on ineffective assistance of counsel to serve as cause because that claim requires a Sixth Amendment right to counsel and no such right exists for discretionary appeals to the Supreme Court of Ohio. *See Mooney v. Ohio*, No. 5:09-cv-2760, 2012 WL 4718587 (N.D. Ohio Oct. 3, 2012). Additionally, because Mr. Johnson is aided by counsel, the court need not independently search the record and find potential arguments that may excuse the default. *See Johnson*, 2019 WL 7284990, at *10. I thus recommend the District Court **DISMISS** Ground Three as procedurally defaulted.

> 3. **Three of the six subclaims that comprise Ground Four are procedurally defaulted because Mr. Johnson did not raise those subclaims before the Supreme Court of Ohio.**

In Ground Four, Mr. Johnson argues his trial counsel's performance was constitutionally deficient. The claim contains six discrete subclaims alleging trial counsel did not (1) strike Juror 21

from the jury, (2) raise a *Daubert* challenge to cell-phone testimony, (3) object to the admission of unauthenticated cell-phone records, (4) object to testimony about Mr. Johnson's alleged gang involvement, (5) seek a cautionary instruction aimed at testimony about the alleged gang involvement, or (6) object to the State asking leading questions on direct examination. (ECF #1-2 at PageID 27-34). The State argues Mr. Johnson may proceed only on the errors he raised before the Supreme Court of Ohio and he did not raise Subclaims Two, Five, and Six before that court. (*See* ECF #9 at PageID 94-96). The State concedes Subclaims One, Three, and Four were presented to that court. (*See id.* at PageID 94). I agree with the State that Subclaims Two, Five, and Six are procedurally defaulted.

Habeas petitioners must present their habeas claims to the Supreme Court of Ohio under the same theory they present for federal habeas review. *See Caver v. Straub*, 349 F.3d 340, 346 (6th Cir. 2003). As applied to ineffective-assistance claims, this rule requires a habeas petitioner base an ineffective-assistance claim on the same allegedly ineffective actions by counsel presented to the state court. *Id.* Thus, habeas review is limited to the attorney errors Mr. Johnson presented to the Supreme Court of Ohio.

In that court, Mr. Johnson argued his trial counsel was ineffective for not objecting to (i) testimony about gang activity (Subclaim Four) (ECF #9-1 at PageID 387-89) and (ii) the admission of unauthenticated cell-phone records (Subclaim Three) (*id.* at PageID 392). These two subclaims were thus presented to the state courts. Mr. Johnson mentioned Subclaim One, but not in the context of an ineffective-assistance claim. He mentions Subclaim One while arguing the trial court had an independent obligation to strike Juror 21 after his trial counsel did not. (*See id.* at PageID 387) ("trial counsel's failure to inquire and strike . . . result[ed] in fatally prejudicial

25

empaneling of a jury"). While it is uncertain whether this sentence was enough to fairly present an ineffective-assistance claim, the State concedes the claim was presented. (ECF #9 at PageID 94) ("[Mr. Johnson] only advanced three of those claims to the Ohio Supreme Court. They are counsel's ineffectiveness in failing to remove juror 21 . . . ."). I thus consider Subclaim One preserved for habeas review.

The other three claims—not bringing a *Daubert* challenge to cell-phone testimony (Subclaim Two), not seeking a cautionary instruction about testimony about Mr. Johnson's alleged gang involvement (Subclaim Five), and not objecting to the State asking leading questions on direct examination (Subclaim Six)—do not appear in Mr. Johnson's appeal to the Supreme Court of Ohio. (*See* ECF #9-1 at PageID 385-95). Thus, Subclaims Two, Five, and Six are procedurally defaulted.

Mr. Johnson does not advance cause and prejudice to excuse this default or assert actual innocence in his Petition or Traverse. In his Traverse, he argues the merits of the non-defaulted claims. (*See* ECF #13 at PageID 1109-14). Because Mr. Johnson is aided by counsel, the court need not independently search the record and identify potential arguments to excuse the default. *See Johnson*, 2019 WL 7284990, at *10. I thus recommend the District Court **DISMISS** Subclaims Two, Five, and Six of Ground Four as procedurally defaulted.

### 4.    Ground Eight is procedurally defaulted because Mr. Johnson did not raise it before the Supreme Court of Ohio.

In Ground Eight, Mr. Johnson argues there was not sufficient evidence to support his convictions. (*See* ECF #1-2 at PageID 36-37). The State argues Mr. Johnson procedurally defaulted this claim by not arguing it before the Supreme Court of Ohio. (ECF #9 at PageID 121-23). As discussed above, before the federal court may review a habeas claim, the petitioner must first

present his claim to the Supreme Court of Ohio. *See Baston*, 282 F.Supp.2d at 661. Before the Supreme Court of Ohio, Mr. Johnson did not challenge the sufficiency of evidence supporting his conviction. (ECF #9-1 at PageID 380, 385-95). Instead, he argued his conviction was against the manifest weight of the evidence. (*See id.* at PageID 393-94). Under Ohio law, those claims are legally and analytically distinct; thus, raising one claim does not raise the other. *See Hoffman v. Lazaroff*, No. 18-3439, 2018 WL 5849894, at *3 (6th Cir. Sept. 17, 2018); *see also State v. Thompkins*, 678 N.E.2d 541, 549 (Ohio 1997) (Cook, J. concurring). Mr. Johnson does not advance cause and prejudice to excuse this default or assert his actual innocence in his Petition or his Traverse. In his Traverse, he does not mention Ground Eight. (*See* ECF #13 at PageID 1116). Because Mr. Johnson is aided by counsel, the court need not independently search the record and find potential arguments that may excuse the default. *See Johnson*, 2019 WL 7284990, at *10.

I thus recommend the District Court **DISMISS** Ground Eight as procedurally defaulted.

**B.    State-law claims not cognizable on federal habeas review**

**1.    Ground Five, challenging the admissibility of cell-phone records, is not cognizable because the state court's evidentiary decision was not so egregious to deny Mr. Johnson a fundamentally fair trial.**

In Ground Five, Mr. Johnson argues "the admission of testimony as to the content of unauthenticated records" for his cell phone violated the Confrontation Clause and *Crawford v. Washington*, 541 U.S. 36 (2004). (ECF #1-2 at PageID 34-35). The State responds that Ground Five is an attack on the state court's evidentiary ruling and those rulings are not reviewable in habeas corpus—they are "not cognizable"—unless it was a denial of fundamental fairness. (ECF #9 at PageID 106-12). Mr. Johnson argues Ground Five was such a denial. (ECF #13 at PageID 1114-15). I disagree with Mr. Johnson and agree with the State.

"Any review of habeas due process claims based on improper admission of evidence must be cognizant of the Supreme Court's mandate that 'it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.'" *Ege v. Yukins*, 485 F.3d 364, 375 (6th Cir. 2007) (quoting *Estelle v. McGuire*, 502 U.S. 62, 68 (1991)). Under this very deferential standard, habeas relief is warranted "only if an evidentiary ruling is 'so egregious that it results in a denial of fundamental fairness.'" *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). The category of infractions that violate fundamental fairness is defined "very narrowly." *Id.* The Sixth Circuit has opined in dicta that "[w]hether the admission of prejudicial evidence constitutes a denial of fundamental fairness turns upon whether the evidence is material in the sense of a crucial, critical highly significant factor." *Brown v. O'Dea*, 227 F.3d 642, 645 (6th Cir. 2000); *see also Morgan v. Smith*, No. 1:19-cv-093, 2020 WL 1434463, at *3 (S.D. Ohio Mar. 24, 2020) (analyzing *Brown v. O'Dea*), *report and recommendation adopted*, 2021 WL 5630743 (S.D. Ohio Dec. 1, 2021).

Ground Five centers on FBI Special Agent Jacob Kunkle's testimony about cell-phone records from Verizon and Sprint with cell-tower location data for two cell phones around the time of the murder. (*See* ECF #1-1 at PageID 17; *see also* ECF #9-3 at PageID 732-53). The Fifth District held a qualified witness must authenticate those records and concluded Special Agent Kunkle was qualified because he was trained and experienced in using cell-phone records in investigations and familiar with the specific records used here. (*See* ECF #9-1 at PageID 332-36; *see also Johnson*, 203 N.E.3d at 103-05).

Mr. Johnson contends this ruling resulted in a denial of fundamental fairness because Special Agent Kunkle's familiarity with the records at issue did not imply a familiarity with how Sprint or Verizon created and maintained those records. (ECF #1-2 at PageID 33-34). To Mr.

Johnson, "someone with particularized knowledge of the creation and maintenance of such records within the companies is required." (*Id.* at PageID 34).

But the Sixth Circuit (and every other circuit) has rejected the argument that "only those individuals who play a role in the creation or compilation of records can be used to lay the requisite foundation." *United States v. Hathaway*, 798 F.2d 902, 906 (6th Cir. 1986). Moreover, the Fifth District's decision tracks the federal standard to admit business records. *See United States v. Trevino*, 7 F.4th 414, 430 (6th Cir. 2021) ("all that is required is that the witness be familiar with the record keeping system"). Special Agent Kunkle's testimony established his familiarity with Verizon's and Sprint's record-keeping systems, allowing him to authenticate the cell-phone records in this case. *Hathaway*, 798 F.2d at 906 (government agent authenticated business records); *see also United States v. Ramer*, 883 F.3d 659, 678-79 (6th Cir. 2018) (same for bank records). Because the cell-phone records were properly admitted as business records, Ground Five's Confrontation Clause argument is inapplicable to those records. *See Crawford*, 541 U.S. at 56; *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 324 (2009). It was thus not so egregious in a way that results in a denial of fundamental fairness for the Fifth District to uphold admitting the cell-phone records based on Special Agent Kunkle's authentication.

I thus recommend the District Court **DISMISS** Ground Five as not cognizable.

**2.     Ground Six, challenging the admissibility of testimony about a prior unrelated shooting, is not cognizable because the state court's ruling did not result in a denial of fundamental fairness.**

In Ground Six, Mr. Johnson argues the trial court violated his due-process and Fifth Amendment rights by admitting evidence of Mr. Johnson's involvement in another shooting that was both unfairly prejudicial and improper propensity evidence. (ECF #1-1 at PageID 17;

29

ECF #1-2 at PageID 35-36). The State argues Ground Six is not cognizable because state court evidentiary rulings are not reviewable in habeas corpus unless they deny fundamental fairness. (ECF #9 at PageID 112-15). Mr. Johnson argues Ground Six was such a denial. (ECF #13 at PageID 1115-16). I disagree with Mr. Johnson and agree with the State.

As discussed above, habeas review of state-law issues, including a state court's evidentiary rulings, is subject to a very deferential standard of review. *See Ege*, 485 F.3d at 375. Under that standard, habeas relief is warranted only if the evidentiary ruling is so egregious that it fits into the narrow category of infractions that deny fundamental fairness. *Bugh*, 329 F.3d at 512. And the Sixth Circuit has noted in dicta that whether the admission of prejudicial evidence denies fundamental fairness turns on whether the evidence is "material in the sense of a crucial, critical highly significant factor." *See Brown*, 227 F.3d at 645.

Ground Six focuses on testimony that Mr. Johnson had been shot in the leg several years ago. (*See* ECF #9-1 at PageID 337-39; *Johnson* 203 N.E.3d at 105-06). The State called one of Mr. Johnson's cellmates to testify that Mr. Johnson admitted his involvement in the shooting and the witness mentioned Mr. Johnson told him of having been shot in the leg a few years before the murder. (ECF #9-3 at PageID 710-12, 723-24).

Mr. Johnson argues the testimony denied him fundamental fairness because the years-old shooting was not relevant to the murder and highly prejudicial because it intimated Mr. Johnson was a gang member and allowed an inference that he had a propensity for violence and so was more likely to have committed the murder. (*See* ECF #1-2 at PageID 35; ECF #13 at PageID 1115-16). Mr. Johnson further argues the Fifth District did not conduct the proper balancing analysis of this evidence. (ECF #13 at PageID 1115).

Whether the evidence is characterized as being improper because it is more unfairly prejudicial than probative or suggesting bad character or a propensity for violence, neither issue implicates fundamental fairness. Regarding unfairly prejudicial testimony, the Sixth Circuit has observed the Supreme Court "has repeatedly rejected claims that prejudicial evidence violated due process." *Stewart v. Winn*, 967 F.3d 534, 538 (6th Cir. 2020) (collecting Supreme Court cases). Regarding character or propensity evidence, the Sixth Circuit notes there is no "Supreme Court precedent indicating that a state court violates a criminal defendant's due process rights when it properly admits evidence of the defendant's other bad acts." *Bey*, 500 F.3d at 520. Mr. Johnson does not point to any Supreme Court case since *Bey* holding otherwise. Thus, Mr. Johnson does not demonstrate the trial court's admission of evidence about him being shot years before the murder resulted in a denial of fundamental fairness.

I thus recommend the District Court **DISMISS** Ground Six as not cognizable.

**3.      Ground Seven, arguing Mr. Johnson's convictions are against the manifest weight of the evidence, is not cognizable under settled Sixth Circuit law.**

In Ground Seven, Mr. Johnson argues his convictions are against the manifest weight of the evidence. (ECF #1-2 at PageID 35-36). But claims regarding the manifest weight of the evidence are grounded in state law and therefore not cognizable in habeas corpus. *See, e.g.*, *Walker v. Engle*, 703 F.2d 959, 969 (6th Cir. 1983); *Nash v. Eberlin*, 258 F.App'x 761, 764 n.4 (6th Cir. 2007). Accordingly, I recommend the District Court **DISMISS** Ground Seven as not cognizable.

**4.      Ground Nine, which argues cumulative error, is not cognizable under settled Sixth Circuit law.**

In Ground Nine, Mr. Johnson argues the cumulative effect of Grounds One through Eight denied him his right to a fair trial. (ECF #1-2 at PageID 37). "[T]he law of this Circuit is that cumulative error claims are not cognizable on habeas because the Supreme Court has not spoken

on this issue." *Williams*, 460 F.3d at 816; *see also Kelly v. Collins*, No. 20-3221, 2020 WL 5000062, at *6 (6th Cir. June 26, 2020) (citing *Williams*, 460 F.3d 789). Mr. Johnson does not cite any Supreme Court precedent on the issue despite asserting in Ground Nine that "the State Court's holding is contrary to and involved an unreasonable application of clearly established Supreme Court of the United States' precedent." (ECF #13 at PageID 1116). Accordingly, I recommend the District Court **DISMISS** Ground Nine as not cognizable.

**C.     Merits review**

    **1.     The remaining three subclaims of Ground Four are each without merit.**

As discussed above, Ground Four, arguing ineffective assistance of trial counsel, has six discrete subclaims, three of which are procedurally defaulted. The remaining claims allege trial counsel erred in not (i) striking Juror 21 from the jury, (ii) objecting to the admission of unauthenticated cell-phone records, and (iii) objecting to testimony about Mr. Johnson's alleged gang involvement.

As noted earlier, AEDPA "dictates a highly deferential standard for evaluating state-court rulings which demands that state-court decisions be given the benefit of the doubt." *Bell*, 543 U.S. at 455 (citation and quotation omitted). Accordingly, Mr. Johnson must demonstrate the Fifth District's adjudication of his ineffective-assistance claim either "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceedings." *See* 28 U.S.C. § 2254(d).

The two-part test in *Strickland v. Washington*, 486 U.S. 668 (1984), is the clearly established federal law governing ineffective-assistance claims. This standard requires the habeas petitioner

establish (1) counsel's representation fell below an objective standard of reasonableness based on all the circumstances in the case, such that the attorney did not function as "counsel" guaranteed by the Sixth Amendment, and (2) counsel's deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687-88. To satisfy the deficiency prong, the habeas petitioner "must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 668. And to satisfy the prejudice prong, the habeas petitioner must show "a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. A reasonable probability is one sufficient to undermine confidence in the outcome." *Id.* at 694.

Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. *See Harrington*, 562 U.S. at 105. The standards of *Strickland* and § 2254(d) are both highly deferential, *see Strickland*, 486 U.S. at 689; *Lindh*, 521 U.S. at 333, n.7, and when the two apply in tandem, review is "doubly so." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). The *Strickland* standard is a general one, so the range of reasonable applications is substantial. *Mirzayance*, 556 U.S. at 123. Additionally, unreasonableness under *Strickland* is different from unreasonableness under § 2254(d). *Harrington*, 562 U.S. at 105. When § 2254(d) applies, the question is not whether counsel's actions were reasonable. *Id.* Instead, the question is whether there is reasonable argument exists that counsel satisfied *Strickland*'s deferential standard. *Id.*

### a.    Subclaim 1: Not challenging Juror 21 for bias or lodging a peremptory strike

Mr. Johnson's first subclaim argues his trial counsel was ineffective for not striking Juror 21 from the venire after she suggested a potential bias against Mr. Johnson. (*See* ECF #1-2 at PageID 27-28). The Fifth District rejected this argument after finding Juror 21 was not biased and thus Mr. Johnson's counsel was not ineffective for allowing the juror to be seated:

During voir dire, Juror No. 21 recalled that she had seen an article about the case in the newspaper. The trial judge then asked the juror if, based upon what the juror heard about the case, the juror felt that she already made up her mind about the guilt or innocence of the Defendant. Juror No. 21 responded, "Well, it tugs on my heart strings, you know, the kid that got killed, that bothers me." The court proceeded to explain the presumption of innocence and asked whether Juror No. 21 could presume Johnson was not guilty. Juror No. 21 replied, "Right, I can do my best. I mean, I just keep thinking about the kid, you know, but I can try to be as fair as I can be." When asked if she could reach a decision based upon the evidence without regard to anything Juror No. 21 may have heard or read, the juror responded "Yes." Subsequently, after reminding the juror that the state has the burden of proof beyond a reasonable doubt, the state inquired of Juror No. 21:

> Prosecutor: And just because we have a victim that tugs at your heart strings doesn't decrease that burden, you still have to hold the State of Ohio to proof beyond a reasonable doubt?
>
> Juror No. 21: Right.
>
> Prosecutor: Can you promise us you can do that?
>
> Juror No. 21: Yeah, I can do it, yeah.
>
> Prosecutor: And not say, well, it's a young child so I'm not going to follow the Court's instructions?
>
> Juror No. 21: Right.
>
> Prosecutor: You're going to follow the Court's instructions, correct?
>
> Juror No. 21: Yes.

In *State v. Mundt,* the Ohio Supreme Court noted,

> Jurors need not be totally ignorant of the facts and issues involved in the case. * * * It is beyond question that mere prior knowledge of the existence of the case, or familiarity with the issues involved, or even some preexisting opinion as to the merits, does not in and of itself raise a presumption of jury taint; such a standard would be certainly unsalutary, and likewise impossible to achieve.

When a defendant bases an ineffective-assistance-of-counsel claim on an assertion that his counsel allowed the empanelment of a biased juror, the defendant

34

"*must* show that the juror was actually biased against him." In *Bates,* the Ohio Supreme Court instructed that,

> Actual bias is "bias in fact"—the existence of a state of mind that leads to an inference that the person will not act with entire impartiality. In sum, Bates must prove that at least one of the jurors at his trial, because of the juror's partiality or biases, was not capable and willing to decide the case solely on the evidence before that juror.

> Actual bias can be found from a juror's express admission or from circumstantial evidence of the juror's biased attitudes. For example, courts have found actual bias when a juror unequivocally stated that she could not be fair due to law-enforcement bias, when a juror had a fixed opinion of the defendant's guilt based on pretrial publicity, or when a juror expressed views on the death penalty that would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.

The record does not establish that Juror No. 21 harbored any bias toward Johnson. Juror No. 21 never stated that she could not be fair. To the contrary, the juror's responses indicated that she would be an open-minded juror. The only issue Juror No. 21 expressed was the emotional difficulty of hearing a case involving the death of a child, not a bias against Johnson. Accordingly, Johnson has not established actual bias or that he suffered prejudice because his attorney allowed Juror No. 21 to be seated as a juror.

In this case, we can find neither deficient performance by counsel nor a reasonable probability that the result would have been different but for counsel's alleged errors. Accordingly, we reject Johnson's claim of ineffective assistance with respect to prospective Juror No. 21.

(ECF #9-1 at PageID 347-51; *see also Johnson*, 203 N.E.3d at 110-12) (cleaned up).

Mr. Johnson argues the Fifth District improperly concluded the only issue Juror 21 expressed was emotional difficulty in hearing a case involving a child's death. (ECF #13 at PageID 1111). He also takes issue that Juror 21 was not asked whether she could be fair to Mr. Johnson and only said she "can try to be as fair as I can be," not that she would be fair. (*Id.*).

To demonstrate his trial counsel's failure to strike Juror 21 was ineffective assistance, Mr. Johnson must show Juror 21 was actually biased against him. *See Miller v. Webb*, 385 F.3d 666, 674

(6th Cir. 2004). Actual bias means "'bias in fact'—the existence of a state of mind that leads to an inference that the person will not act with entire impartiality." *Id.* at 673 (cleaned up). Actual bias can be revealed through a prospective juror's express admission. *See Hughes v. United States*, 258 F.3d 453, 456 (6th Cir. 2001) ("Juror: I don't think I could be fair"). But, more often, jurors are reluctant to admit actual bias so biased attitudes must often be discovered through circumstantial evidence. *See id.* at 459.

Under the Sixth Amendment, the longstanding Supreme Court standard for juror impartiality is:

> To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

*Irvin v. Dowd*, 366 U.S. 717, 723 (1961).

Juror 21 was one of ten prospective jurors who indicated having previous knowledge of Mr. Johnson's case. (ECF #9-2 at PageID 469-70). When asked if she had made up her mind about Mr. Johnson's guilt or innocence, she replied, "Well, it tugs on my heartstrings, you know, the kid that got killed, that bothers me . . . Like everybody else." (*Id.* at PageID 484). The trial court then asked if she could still apply the presumption of innocence and Juror 21 responded, "I can do my best. I mean I just keep thinking about the kid, you know, but I can try to be as fair as I can be." (*Id.* at PageID 484). The court then asked, "Are you capable of basing your decision solely on the evidence that you would hear in this courtroom and without regard to anything that you may have read or heard about the case?" Juror 21 replied, "Yes." (*Id.* at PageID 484-85). Both the prosecutor and Mr. Johnson's counsel asked comparable questions and Juror 21 replied she could follow the

judge's instructions about the burden of proof and the presumption of innocence. (*Id.* at PageID 486-87, 488). In group voir dire, Juror 21 was asked again about the burden of proof and the presumption of innocence and she conveyed she would apply those principles as instructed. (*See id.* at PageID 519, 570).

Here, Juror 21 expressed sympathy for the victim, not too far from the statement of partiality in *Miller* where the juror stated she "would be kind of partial to [the victim] . . . because I kind of have sympathy for her in this case, with her being the victim." 385 F.3d at 674. In such a situation, it is essential that a juror "swear that [she] could set aside any opinion [she] might hold and decide the case on the evidence." *Patton v. Yount,* 467 U.S. 1025, 1036 (1984). The judge asked her if she could base her decision "solely on the evidence that [she] would hear in this courtroom" and she replied she could. (ECF #9-2 at PageID 484-85). Through the rest of voir dire, her answers were consistent on that issue. (*See id.* at PageID 486-87, 488, 519, 570).

Because Juror 21 assured the court of her impartiality and all her later statements were consistent with that assurance, Mr. Johnson has not demonstrated that Juror 21 was actually biased against him. Thus, the Fifth District did not unreasonably apply *Strickland* in concluding that trial counsel's decision to leave Juror 21 on the panel was not deficient and did not prejudice Mr. Johnson.

I thus recommend the District Court **DENY** this subclaim as meritless.

> **b.    Subclaim 3: Not objecting to the admission of unauthenticated cell-phone records under the Confrontation Clause**

In Subclaim 3 to Ground Four, Mr. Johnson argues his trial counsel was ineffective for not objecting to testimony about the unauthenticated cell-phone records. (ECF #1-2 at PageID 31). The Fifth District rejected this subclaim by resting on its earlier decision on Ground Five:

Johnson next argues that his trial counsel was ineffective in failing to challenge the cell phone records, the testimony of Agent Jacob Kunkle, and his historical cell phone analysis report.

As we have found in our disposition of Johnson's Fifth Assignment of Error, the cell phone records, the report and the testimony of Agent Kunkle were properly admitted by the trial court.

Accordingly, we reject Johnson's claim of ineffective assistance with respect to the cell phone evidence.

(ECF #9-1 at PageID 351; *see also Johnson*, 203 N.E.3d at 112).

Under the doubly deferential standard of review, the Fifth District's decision was not unreasonable. As stated in Ground Five above, the Fifth District held that under Ohio evidence law, Special Agent Kunkle could authenticate the Verizon and Sprint cell-phone records. A federal habeas court is bound by the state court's interpretation of its own laws, including when that interpretation is announced on direct review. *Richey*, 546 U.S. at 76. Thus, the District Court must defer to the Fifth District's conclusion that the cell-phone records were properly admitted. Because the records were admissible, Mr. Johnson's counsel was not ineffective for not raising a meritless objection to admissible evidence. *See Hoffner v. Bradshaw*, 622 F.3d 487, 499 (6th Cir. 2010) (counsel is not ineffective for not pursuing a meritless claim or raise a meritless objection). Thus, the Fifth District did not unreasonably apply *Strickland* in concluding Mr. Johnson's counsel was not deficient.

I thus recommend the District Court **DENY** this subclaim as meritless.

### c.    Subclaim 4: Not objecting to testimony about Mr. Johnson's alleged gang involvement

In Subclaim Four of Ground Four, Mr. Johnson argues his counsel was ineffective for not objecting to highly prejudicial testimony regarding Mr. Johnson's alleged gang involvement. (ECF #1-2 at PageID 31-33; ECF #13 at PageID 1113-14). The Fifth District concluded this

testimony was properly admitted under Ohio Evidence Rules 404(B) to show Mr. Johnson's

motive for the shooting and that purpose outweighed the danger of unfair prejudice, and thus Mr.

Johnson's counsel was not ineffective for raising a meritless objection. (*See* ECF #9-1 at

PageID 351-56; *see also Johnson*, 203 N.E.3d at 112-14).

Under the doubly deferential standard of review, the Fifth District's decision was not

unreasonable. Mr. Johnson argues the Fifth District improperly balanced the probative value of the

testimony against the danger of unfair prejudice, but a federal habeas court is bound by the state

court's interpretation of its own laws, including when that interpretation is announced on direct

review. *Richey*, 546 U.S. at 76. Thus, the District Court must defer to the Fifth District's

conclusion that the evidence was properly admitted. Because the evidence was admissible, Mr.

Johnson's counsel was not ineffective for omitting a meritless objection to admissible evidence. *See*

*Hoffner*, 622 F.3d at 499. Thus, the Fifth District did not unreasonably apply *Strickland* in

concluding Mr. Johnson's counsel was not deficient.

I thus recommend the District Court **DENY** this subclaim as meritless.

**2.      Even if Grounds Five or Six were denials of fundamental fairness so as to be cognizable, they lack merit because there is no Supreme Court precedent on the kinds of evidence at issue.**

Even if Ground Five or Six were cognizable, Mr. Johnson would not be entitled to habeas

relief. To have a meritorious habeas claim challenging a state court's evidentiary ruling, a

petitioner must identify "a Supreme Court case establishing a due process right with regard to [the]

specific kind of evidence at issue" that the state court's evidentiary ruling was contrary to or

unreasonably applied. *Perez-Aguilar v. Howard*, No. 24-1340, 2024 WL 4800717, at *2 (6th Cir.

Aug. 13, 2024), *cert. denied*, 145 S.Ct. 1094 (2025).

Mr. Johnson does not point to a Supreme Court case establishing a state violates due process by introducing unauthenticated business records. He cites *Crawford*, but that case bars testimonial hearsay under the Confrontation Clause. (ECF #1-2 at PageID 34, ECF #13 at PageID 1114-15). Business records are generally considered not to be testimonial, so the Supreme Court has found they do not implicate the Confrontation Clause. *See Crawford*, 541 U.S. at 56; *Melendez-Diaz*, 557 U.S. at 324. Thus, even if Ground Five were cognizable, the claim fails on the merits because Mr. Johnson has not established the admission of unauthenticated business records is contrary to Supreme Court precedent.

Mr. Johnson does not cite any Supreme Court case in support of Ground Six. (*See* ECF #1-2 at PageID 35; ECF #13 at PageID 1115-16). Whether the evidence about his being shot years prior is viewed as unfairly prejudicial or as character evidence, there is no applicable Supreme Court precedent. On propensity evidence, the Sixth Circuit has held there is "no clearly established Supreme Court precedent . . . [that] holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence." *Stewart*, 967 F.3d at 538 (quoting *Bugh*, 329 F.3d at 512-13). On prejudicial evidence, the Sixth Circuit has stated "'the Supreme Court has never held (except perhaps within the capital sentencing context) that a state trial court's admission of relevant evidence, no matter how prejudicial, amounted to a violation of due process.'" *Bozeman v. Schiebner*, No. 24-1973, 2025 WL 1291960, at *6 (6th Cir. Apr. 2, 2025) (quoting *Blackmon v. Booker*, 696 F.3d 536, 551 (6th Cir. 2012)).

Thus, even if Grounds Five or Six were cognizable, each claim would fail on the merits because Mr. Johnson has not established the admission of the evidence at issue is contrary to Supreme Court precedent.

40

**3.    Even if Ground Eight were not procedurally defaulted, it lacks merit because Mr. Johnson only raises credibility issues that do not advance a sufficiency-of-the-evidence claim.**

In Ground Eight, Mr. Johnson argues there is not sufficient evidence to support his convictions because "overwhelmingly, the evidence presented at trial was speculative and circumstantial," relied on Mr. Johnson's "perceived affiliation with a Chicago gang," had "no direct evidence of [Mr. Johnson]'s guilt," and "was also built on unreliable and unauthenticated cell location information" and "testimony from jailhouse snitches." (ECF #1-2 at PageID 36-37).

Even if Mr. Johnson had not procedurally defaulted this claim, it does not properly present a sufficiency-of-the-evidence challenge. When a petitioner challenges the legal sufficiency of evidence, "the relevant question is whether, *after viewing the evidence in the light most favorable to the prosecution*, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). "[T]his inquiry does not require a court to 'ask itself whether *it believes* that the evidence at the trial established guilt beyond a reasonable doubt." *Id.* (emphasis in original) (quoting *Woodby v. INS*, 385 U.S. 276, 282 (1966)). But "credibility is not a matter of review for a federal habeas corpus court." *Walker*, 703 F.2d at 969. Ground Eight contravenes this standard and asks the District Court to re-assess the reliability of testimony and exhibits, re-weigh the relative weight of the evidence against him, and decide whether all the evidence proved guilt beyond a reasonable doubt. None of these are proper in a sufficiency-of-the-evidence challenge. Thus, even if Ground Eight were not procedurally defaulted, Mr. Johnson's arguments against the credibility and relative weight of the evidence against him do not attack the legal sufficiency of that evidence.

### CERTIFICATE OF APPEALABILITY

A habeas petitioner may not appeal the denial of an application for a writ of habeas corpus unless a judge issues a COA and specifies the issues that can be raised on appeal. 28 U.S.C. § 2253(c). "A [COA] may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." § 2253(c)(2). When a district court has determined a petitioner's constitutional claim to lack merit, the petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claim debatable or wrong" before receiving a COA. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). When the district court denies a habeas petition on procedural grounds without reaching the petitioner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling. *Id.* A showing that the appeal would succeed on the claim is not needed to grant a COA. *Miller-El v. Cockrell*, 537 U.S. 322, 337 (2003).

Mr. Johnson has not made a substantial showing that he was denied any federal constitutional right. Jurists of reason would not find it debatable whether the grounds for relief are meritorious federal constitutional claims or are procedurally defaulted. I thus recommend the District Court **DENY** Mr. Johnson a COA for all grounds of his petition.

### CONCLUSION AND RECOMMENDATION

For these reasons, I recommend the District Court **DISMISS** Grounds One, Two, Three, Subclaims Two, Five, and Six of Ground Four, and Ground Eight as procedurally defaulted; **DISMISS** Grounds Five, Six, Seven, and Nine as not cognizable; **DENY** Subclaims One, Three,

and Four of Ground Four as meritless; and **DISMISS** the petition. I further recommend the

District Court **DENY** Mr. Johnson a certificate of appealability on all grounds.

Dated: June 16, 2025

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

### Objections, Review, and Appeal

**Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge.** *See* Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). **Properly asserted objections shall be reviewed de novo by the assigned district judge.**

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).