**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| TREJUAN JOHNSON, | ) | Case No. 5:24-cv-1137 |
| | ) | |
| Petitioner, | ) | Judge J. Philip Calabrese |
| | ) | |
| v. | ) | Magistrate Judge Darrell A. Clay |
| | ) | |
| ANTHONY DAVIS, Warden, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

**OPINION AND ORDER**

A jury in State court found Petitioner Trejuan Johnson guilty of two counts of murder, one count of improperly discharging a firearm at or into a habitation, seven counts of felonious assault, and additional firearm specifications for each count, for which he received a sentence of seventy-two years to seventy-six years to life in prison. After unsuccessfully pursuing appeals and post-conviction relief in the State courts, Petitioner sought a writ of habeas corpus. The Magistrate Judge recommends that the Court dismiss the petition as procedurally defaulted, not cognizable, and meritless and recommends that the Court deny Petitioner a certificate of appealability on all grounds. Petitioner objects. For the reasons that follow, the Court **OVERRULES** Petitioner's objections, **ADOPTS** the Magistrate Judge's report and recommendation, and **DENIES** and **DISMISSES** the petition. Further, the Court **DENIES** a certificate of appealability.

## FACTUAL AND PROCEDURAL BACKGROUND

In the early morning of July 22, 2020, Aaron Lucas, his three children, Lucas's girlfriend, and her two children were asleep in their residence in Canton, Ohio. (ECF No. 9-1, PageID #300.) Around 2:00 a.m., the couple was awakened by the sound of gunfire. (*Id.*) After the gunfire stopped, the couple went to check on the children. (*Id.*) Lucas brought his three children into the bedroom and discovered that his nineteen-month-old twins were injured. (ECF No. 9-2, PageID #631.) The twins were taken to the hospital. (*Id.*) Tragically, one twin died from three gunshot wounds, and the second twin was treated for a single gunshot wound and released. (*Id.*)

### A. Investigation

Following the shooting, officers obtained security footage from cameras positioned around the outside of the residence. (*Id.*, PageID #635; ECF No. 9-5, PageID #842–43.) The footage shows three men walk toward the residence, fire at the residence, and then run away. (ECF No. 9, PageID #58.) The individuals' faces are not visible. (*Id.*) Officers acquired additional security footage after canvassing the surrounding neighborhood. (ECF No. 9-5, PageID #844–48.) From the footage, investigators identified two suspect vehicles. (*Id.*, PageID #846.) The vehicles, a silver Chrysler 200 with an issue with the front passenger-side tire and a white Dodge Charger with black sidemirrors and black metallic rims, are captured travelling north following the shooting. (*Id.*, PageID #845–47.)

Officers also recovered twenty-three spent casings from the scene. (ECF No. 9-2, PageID #648 & #650.) A firearms expert from the Stark County crime laboratory determined that three guns were used in the shooting. (ECF No. 9-3,

PageID #774.) Analysis of the two bullets recovered from the deceased child's body did not identify which gun fired the fatal shots. (*Id.*, PageID #775–78.)

Lucas, the father of the deceased child, admitted to the investigator that he had been involved in at least six robberies of street gang members and drug traffickers in Canton, including robbing Trejuan Johnson's brother. (ECF No. 9-5, PageID #850–51.) Later in the investigation, on at least three occasions, Mr. Johnson confirmed that Lucas robbed his brother. (*See id.*, PageID #859 (during the execution of the search warrant on Mr. Johnson's sister's house); *id.*, PageID #863 (during Mr. Johnson's interview with Detective Michael Volpe and Special Agent Mark McMurphy); ECF No. 9-4, PageID #799 (while incarcerated awaiting trial, to his cellmate).)

**A.1. The Vehicles**

By July 26, 2020, four days after the shooting, both vehicles were recovered. (ECF No. 9-5, PageID #854 & #857.) The officers located the Chrysler 200 (*id.*, PageID #854) and, during the investigation, learned that the driver obtained the vehicle "that day" from his cousin, Davai Woodson (*id.*, PageID #855), who is a friend of Mr. Johnson (ECF No. 9-3, PageID #681). The vehicle's front bumper was damaged, and the front, right wheel had a spare tire on it. (ECF No. 9-5, PageID #956.)

Detective Volpe assisted with the execution of a search warrant on the residence of Mr. Johnson's sister, where a Dodge Charger was found. (*Id.*, PageID #857.) Mr. Johnson was present during the execution of the search warrant. (*Id.*, PageID #859.) Detective Volpe asked Mr. Johnson if he knew Lucas. (*Id.*)

Mr. Johnson responded that Lucas had robbed his brother. (*Id.*) Mr. Johnson's vehicle—a white Dodge Charger with black mirrors, distinctive rust marks on the rear driver's side, and silver-gray rims—was impounded at that time. (*Id.*, PageID #857–58.)

Both vehicles had distinguishing characteristics that matched the vehicles seen on security footage driving away from the residence on the night of the shooting. (*Id.*, PageID #845–847.) However, Mr. Johnson's impounded Dodge Charger had silver rims, and the Dodge Charger seen on the video footage after the shooting had black metallic rims. (*Id.*) Given the discrepancy involving the rims, investigators identified the license plate number of Mr. Johnson's vehicle and ran it through the license plate reader system. (*Id.*, PageID #852; ECF No. 9-4, PageID #820–21.) By reviewing a video and photograph of Mr. Johnson's vehicle from July 17, 2020, investigators confirmed that Mr. Johnson's vehicle had black rims five days before the shooting. (ECF No. 9-4, PageID #820–22.)

In addition to the license plate reader footage, Detective Volpe received records for the Facebook account associated with Mr. Johnson. (ECF No. 9-5, PageID #865.) The records contained a photograph of Mr. Johnson's white Dodge Charger with the same license plate as the impounded vehicle, but it had black side mirrors and black rims. (*Id.*, PageID #871.)

### A.2. Mr. Johnson's Interviews

On August 7, 2020, Detective Volpe and Special Agent McMurphy interviewed Mr. Johnson. (*Id.*, PageID #863.) During the interview, Mr. Johnson reiterated that Lucas had robbed his brother. (*Id.*, PageID #863.) Mr. Johnson claimed that, on the

day of the shooting, he was at his brother's house all day and all night. (*Id.*, PageID #864.) Mr. Johnson's brother lived in the Bexley Townhouse apartments in Canton, Ohio. (*Id.*, PageID #875.) Investigators mapped out the most direct route from the Bexley apartments to the crime scene. (*Id.*, PageID #876–77.) The route included an intersection where, the morning of the shooting, cameras captured the Dodge Charger and Chrysler 200 stopped at a traffic light. (*Id.*, PageID #846–47 & #877.)

## B. Trial

On November 19, 2020, a grand jury indicted Mr. Johnson on two counts of murder, one count of improperly discharging a firearm at or into a habitation, seven counts of felonious assault, and one count of having a weapon while under disability. (*Id.*, PageID #130–36.) Mr. Johnson pleaded not guilty to all charges. (*Id.*, PageID #138.)

### B.1. *Voir Dire* and Covid-19 Protocols during Trial

When Mr. Johnson's trial began on September 27, 2021, the State trial court implemented a mask mandate for all visitors and employees who entered court facilities due to the ongoing Covid-19 pandemic. *See* Order Mandating Masks and Temperature Scanning, C.P. Stark Cnty. (Aug. 31, 2021). Because this mandate was in effect during Mr. Johnson's trial, all jurors were required to wear masks throughout the proceedings. (ECF No. 9-2, PageID #450–51.) Similarly, instead of conducting *voir dire* by sidebar, the trial court held *voir dire* for individual jurors in a separate room with adequate space for social distancing. (*Id.*, PageID #468–73.) On behalf of Mr. Johnson, trial counsel consented to the arrangements for individual *voir dire*. (*Id.*, PageID #472–73.) Trial counsel had the opportunity to consult with

Mr. Johnson at any time during individual *voir dire* and did meet with him when necessary. (*Id.*, PageID #473 & #504–05.)

### B.2. Trial

At trial, the jury found that the State established Mr. Johnson was one of the three gunmen involved in the death of the nineteen-month-old child. (ECF No. 9-1, PageID #142.)

#### B.2.a. Testimony from Detective Volpe

At trial, Detective Volpe testified that, several days after the shooting, police publicly released the security camera footage showing the three individuals firing at the house and running off. (ECF No. 9-5, PageID #851.) Investigators received leads on potential suspects, including the names of "Jerk" and "J. Milli." (*Id.*, PageID #852.) Based on past investigations, the Canton police were familiar with Jonas Hudson, whose alias is "Jerk" and who lives in the Canton area. (*Id.*, PageID #852–53.) Investigators identified Jamal Smith as "J. Milli" and tracked him to the Chicago area. (*Id.*, PageID #853.) Detective Volpe testified that Mr. Johnson said he knew Hudson as "Jerk" but denied knowing "J. Milli." (*Id.*, PageID #864.) The State presented a photograph from Mr. Johnson's Facebook account, and Detective Volpe identified Mr. Johnson, Hudson, and Woodson in the photograph. (*Id.*, PageID #872–73.)

The prosecutor asked Detective Volpe whether Hudson and Smith were affiliated with any gangs in the area. (*Id.*) Mr. Johnson's counsel objected, but the State trial court overruled the objection. (*Id.*) Detective Volpe testified that, through another investigation, Hudson was known to be affiliated with the Black Gangster

Disciples gang. (*Id.*, PageID #854.) Also, Detective Volpe testified that the Chicago police and FBI affirmed that "Jerk" and "J. Milli" were affiliated with the Black Gangster Disciples gang. (*Id.*)

**B.2.b. Testimony from Special Agent Kunkle**

After learning the phone numbers for Woodson and Hudson, Detective Volpe obtained search warrants for their phone records. (*Id.*, PageID #861.) Detective Volpe provided the phone records to Special Agent Kunkle who specializes in analyzing cellular records and received over 400 hours of classroom and on-the-job training. (*Id.*, PageID #861–62; ECF No. 9-3, PageID #728–30 & #735–36.) At the time, Special Agent Kunkle had performed thousands of historical record analyses and had previously testified as an expert in Stark County. (ECF No. 9-3, PageID #730–31.) The trial court certified Special Agent Kunkle as an expert in historical cell hone records analysis, without objection. (*Id.*, PageID #731.)

"Call Detail Record" are records kept by a particular phone company in the normal course of business to document the phone communications on the network. (*Id.*, PageID #733.) The recorded information includes the phone numbers involved in the communication, the date, time, and duration of the communication, and the cell phone tower the phone used. (*Id.*, PageID #733–34.) A record is created when a phone responds to the network to receive or send a communication as well as when a phone ends a communication. (*Id.*, PageID #742.) Special Agent Kunkle testified that phone companies maintain these records to manage the dispersal of resources within the network. (*Id.*)

To analyze the phone records, Special Agent Kunkle compares general case facts such as the time, date, and location of key events to the list of cell towers provided by the phone companies. (*Id.*, PageID #736.) Then, he uses the phone records to determine whether the towers were used by the phone during the relevant time (*id.*) and maps a general area of where a phone was during communications (*id.*, PageID #737–38). In this case, the records were from the evening of July 21, 2020 to the early morning of July 22, 2020. (*Id.*, PageID #732.) He compiled a report of his findings which detailed the activity of each cell phone. (*Id.*, PageID #742–747.) From his analysis, Special Agent Kunkle was able to infer the location of the phones. (*Id.*, PageID #746 & #752.)

The phone records for Hudson's cell phone show movement from an area southwest of Massillon toward Canton before heading north. (*Id.*, PageID #746.) A tower used at 11:42 p.m. on July 21, 2020 shows movement toward the Bexley apartments where Mr. Johnson's brother lived. (*Id.*, PageID #748.) At 3:03 a.m. on July 22, 2020, the phone used a tower near the Bexley apartments. (*Id.*, PageID #752.) The phone records for Woodson's cell phone showed similar movements. (*Id.*, PageID #750.) The phone's use of different towers between 10:56 p.m. and 11:51 p.m. on July 21, 2020 reflects northern movement toward the Bexley apartments. (*Id.*, PageID #750–51.) Then, the phone used the same tower near the Bexley apartment multiple times between 12:00 a.m. and 1:36 a.m., at 2:46 a.m., and at 2:47 a.m. (*Id.*, PageID #751.)

#### B.2.c. Testimony from Woodson's and Mr. Johnson's High-School Friend

A high-school friend of Woodson and Mr. Johnson testified at trial. She testified that Woodson paid for her to visit him in Ohio. (*Id.*, PageID #680–81.) The night before the shooting, Woodson invited her to meet him at "Legit's" apartment. (*Id.*, PageID #688–89.) When she arrived at the apartment, Woodson, "Legit," and Hudson were there. (*Id.*, PageID #689–90.) The friend testified that "Legit" is related to Mr. Johnson, but she could not say with certainty that she saw Mr. Johnson at the house that night. (*Id.*, PageID #690 & #697.)

#### B.2.d. Testimony from Mr. Johnson's Cellmates

Detained pending trial, Mr. Johnson shared a cell with Lamar Mitchell and Richard Bennett at different times. (ECF No. 9-4, PageID #796–97; ECF No. 9-3, PageID #706.) Both Mitchell and Bennett came forward with information about the shooting.

At trial, Mitchell testified that Mr. Johnson told him that his brother had been robbed of "some weed . . . [m]oney . . . [and] a little bit of heroin." (ECF No. 9-4, PageID #799.) Mitchell testified that Mr. Johnson said, "J.Milli, some guy from Chicago, somebody named "Jerky" and "Davai" decided to rob the residence of the person who had robbed Mr. Johnson's brother. (*Id.*, PageID #798–800.) Mitchell testified that Mr. Johnson told him details of the shooting. (*Id.*, PageID #797.) Mr. Johnson explained that the group used two cars (a "crack rental" and a Dodge Charger), circled the house, and parked on the street. (*Id.*, PageID #800–01.) Mitchell testified that Mr. Johnson spoke of telling "somebody named Davai to go,

[but] the dude was actually scared to go so [Mr. Johnson] ended up going, they each went around a side of the house and opened fire on the house." (*Id.*, PageID #801.) Mr. Johnson told Mitchell that each person approached the house and had a gun, and he explained that, after the shooting, the group returned to "Legit's house." (*Id.*, PageID #802.) Mitchell testified that Mr. Johnson described his car as having "dark rims on it and then . . . [Mr. Johnson] switched them for chrome rims." (*Id.*, PageID #803.)

By agreeing to testify against Mr. Johnson, Mitchell was released early from prison. (*Id.*, PageID #804.) When asked whether there was a prison code against snitching, Mitchell responded that "when there's a child involved, all that go[es] out the window with me." (*Id.*, PageID #805.)

Bennett testified that Mr. Johnson shared that he was being investigated for murder and shared details of the incident. (*Id.*, PageID #707–08.) Mr. Johnson told Bennett that "somebody had stole, like, $11,000 from him and a couple pounds of marijuana. And he was upset. And so, he had went and shot the house up." (*Id.*, PageID #708.) Bennett testified that Mr. Johnson mentioned "two family members" who participated in the shooting with him and that Mr. Johnson described the two men as "some bad boys" who were involved in the Black Gangster Disciples. (*Id.*) Bennett testified that Mr. Johnson described how the men drove near the residence, parked at a corner, and then walked up to the residence. (*Id.*, PageID #709.) Mr. Johnson was wearing a black hoodie and face mask. (*Id.*) Bennett testified that

Mr. Johnson repeatedly put a towel across his head while wearing his facemask and would ask if Bennett could identify him. (*Id.*, PageID #706-07.)

During Bennett's direct examination, Mr. Johnson's counsel objected to the the prosecution's question regarding Bennett's knowledge of an incident years earlier that involved Mr. Johnson. (ECF No. 9-3, PageID #710.) The State trial court overruled the objection as going to credibility because Detective Volpe's testimony confirmed the occurrence of the incident. (*Id.*, PageID #711; ECF No. 9-5, PageID #870.) Bennett testified that Mr. Johnson said he was shot in the leg years earlier. (ECF No. 9-3, PageID #724.)

### B.3. Conviction and Sentence

On September 30, 2021, a jury found Mr. Johnson guilty of two counts of murder, one count of improperly discharging a firearm at or into a habitation, seven counts of felonious assault, and additional firearm specifications for each count. (ECF No. 9-1, PageID #142–61 & #163–65.) Further, in a bench trial, the trial court found Mr. Johnson guilty of the charge for having weapons while under disability. (*Id.*, PageID #140 & #167–74.) On October 5, 2021, the trial court sentenced Mr. Johnson to an aggregate prison term of seventy-two years to seventy-six years to life. (*Id.*, PageID #167–74.)

## C. Direct Appeals

On October 21, 2021, Mr. Johnson timely appealed his conviction. (*Id.*, PageID #179.) In his brief, Mr. Johnson asserted nine assignments of error. (*Id.*, PageID #183–85.) Mr. Johnson divided his fourth assignment of error into six sub-assignments of error. (*Id.*, PageID #183–84.) On December 5, 2022, the State

intermediate appellate court rejected all of Mr. Johnson's assignments of error and affirmed the trial court's judgement. (*Id.*, PageID #298–359.)

On January 23, 2023, Mr. Johnson filed a notice of appeal to the Ohio Supreme Court. (*Id.*, PageID #363.) He moved to file a delayed memorandum of support (*id.*, PageID #366), which the Ohio Supreme Court granted (*id.*, PageID #377). On April 12, 2023, Mr. Johnson filed a memorandum in support of jurisdiction and asserted eight propositions of law (*id.*, PageID #380). On July 5, 2023, the Ohio Supreme Court declined to exercise jurisdiction. (*Id.*, PageID #417.)

**D. Federal Habeas Petition**

On July 5, 2024, Mr. Johnson petitioned for a writ of habeas corpus. (ECF No. 1.) The petition asserts nine grounds for relief (ECF No. 1-2, PageID #18–37):

(1) the appellate court erred in finding that Mr. Johnson's absence, which was not knowingly, voluntarily, or intelligently waived, did not result in an unjust hearing and a manifest miscarriage of justice.

(2) the appellate court erred in finding that the use of anonymous jurors at Mr. Johnson's trial was not a constitutional violation and a manifest miscarriage of justice.

(3) the appellate court erred in finding that the State's comments concerning the burden of proof throughout the proceedings were not improper and did not affect the outcome of Mr. Johnson's jury trial.

(4) the appellate court erred in finding that trial counsel's performance was not deficient or violative of the Sixth Amendment.

(5) the appellate court erred in finding that the admission of testimony regarding the contents of unauthenticated records was not a plain error and did not violate Mr. Johnson's Fifth and Sixth Amendment rights.

(6) the appellate court erred in finding that the trial court's admission of prejudicial evidence regarding Mr. Johnson's involvement in a previous shooting was proper.

(7) the appellate court erred in finding that Mr. Johnson's convictions were not against the manifest weight of the evidence.

(8) the appellate court erred in finding that the evidence presented at trial was sufficient to sustain Mr. Johnson's convictions.

(9) the appellate court erred in finding that the cumulative effect of multiple errors did not deprive Mr. Johnson of his constitutional right to a fair trial.

Additionally, the fourth ground, raising a claim of ineffective assistance of counsel contains six subclaims (*id.*, PageID #25–34):

(4A) Failure to strike a biased juror.

(4B) Failure to object to or raise a *Daubert* challenge regarding the scientific evidence that the State offered.

(4C) Failure to object to the admission of cell phone records which were not been properly authenticated and identified

(4D) Failure to object to irrelevant and inflammatory testimony regarding Mr. Johnson's alleged gang involvement.

(4E) Failure to request that a limiting instruction be given to the jury regarding testimony alleging gang involvement.

(4F) Failure to object when the State repeatedly posed leading questions to a witness during direct examination.

**D.1. Report and Recommendation**

The Magistrate Judge issued a report and recommendation that the Court dismiss and deny Petitioner's claims for relief. (ECF No. 14, PageID #1119.) As an initial matter, Petitioner breaks his fourth ground for relief into sub-grounds, referring to them alphabetically as A, B, C, D, E, and F. (ECF No. 1-2, PageID #27–34.) However, in the report and recommendation, the Magistrate Judge refers to them as "subclaims" and identifies them numerically as Subclaims One, Two,

Three, Four, Five, and Six. (ECF No. 14, PageID #1119.) For clarity and ease of reference, the Court uses Petitioner's labeling.

The Magistrate Judge recommends dismissing Grounds 1, 2, 3, 4B, 4E, 4F, and 8 as procedurally defaulted; dismissing Grounds 5, 6, 7, and 9 as not cognizable; and denying Grounds 4A, 4C, and 4D as meritless. (*Id.*, PageID #1119.) Further, the Magistrate Judge recommends denying a certificate of appealability on all grounds. (*Id.*)

**D.2. Petitioner's Objections**

On July 24, 2025, Petitioner filed objections to the Magistrate Judge's report and recommendation. (ECF No. 20, PageID #1171–86.) He objects to the Magistrate Judge's recommendation to dismiss Grounds 1, 2, and 9 and to deny Grounds 4A, 4C in connection with 5, and 4D in connection with 6. (*Id.*) The Court takes Petitioner's objections in turn.

## STANDARD OF REVIEW

A district court judge may direct a Magistrate Judge to submit "proposed findings of fact and recommendations for the disposition, by a judge of the court," 28 U.S.C. § 636(b)(1)(B), of a petition for a writ of habeas corpus, which the Court does by Local Rule, *see* L.R. 72.2. When reviewing a report and recommendation, if a party objects within the allotted time, the district court is required to "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which the objection is made." 28 U.S.C. § 636(b)(1)(C); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir. 1981). Objections must be specific, not general, and should direct the Court's attention to a particular dispute. *Howard*

*v. Secretary of Health & Hum. Servs.,* 932 F.2d 505, 509 (6th Cir. 1991). "The filing of objections to a magistrate's report enables the district judge to focus attention on those issues—factual and legal—that are at the heart of the parties' dispute." *Thomas v. Arn*, 474 U.S. 140, 147 (1985).

Upon review, the court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge." 28 U.S.C. § 636(b)(1)(C). Importantly, the Court's job is not to conduct a free-wheeling examination of the entire report and recommendation, but only to address any specific objections that a party has advanced to some identified portion of it. Accordingly, it is the Court's task in this matter to review the Magistrate Judge's report and recommendation de novo, based on the specific objections that Petitioner raises.

## ANALYSIS

Where a petitioner is "in custody in violation of the Constitution or laws or treaties of the United States," he is entitled to a writ of habeas corpus. 28 U.S.C. §§ 2241(c)(3) & 2254(a). The writ tests the fundamental fairness of State court proceedings resulting in the deprivation of an individual's liberty. *See, e.g.*, *Brown v. Allen*, 344 U.S. 443, 463 (1953); *Powell v. Collins*, 332 F.3d 376, 388 (6th Cir. 2003) (citing *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991)); *Skaggs v. Parker*, 235 F.3d 261, 266 (6th Cir. 2000). 28 U.S.C. § 2254(d) provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

"With the AEDPA, Congress limited the source of law for habeas relief to cases decided by the United States Supreme Court." *Herbert v. Billy*, 160 F.3d 1131, 1135 (6th Cir. 1998); *see also Williams v. Taylor*, 529 U.S. 362, 412 (2000).

A State court adjudication is "contrary to" Supreme Court precedent under Section 2254(d)(1) "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law," or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent" and arrives at a different result. *Williams*, 529 U.S. at 405. "Avoiding these pitfalls does not require citation of [Supreme Court] cases—indeed, it does not even require awareness of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002).

Under Section 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law. *See Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Williams*, 529 U.S. at 410). A State court adjudication involves "an unreasonable application of" Supreme Court precedent under Section 2254(d)(1) in one of two ways: (1) if the State court identifies the correct governing legal rule from the Supreme Court's cases[,] but unreasonably applies it to the facts of the particular State prisoner's case; or (2) if the State court either unreasonably

extends a legal principle from the Court's precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply. *See Williams*, 529 U.S. at 407.

At bottom, the writ tests the fundamental fairness of the State court proceedings resulting in the deprivation of the petitioner's liberty. *See, e.g.*, *Brown v. Allen*, 344 U.S. 443, 463 (1953); *Powell v. Collins*, 332 F.3d 376, 388 (6th Cir. 2003) (citing *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991)); *Skaggs v. Parker*, 235 F.3d 261, 266 (6th Cir. 2000).

## I. Procedural Default

Before the Court can evaluate the merits of a claim raised in a habeas petition, a petitioner must establish that the claim was not procedurally defaulted. Generally, a petitioner must demonstrate that he has "exhaust[ed] all available opportunities to pursue his claim in state court." *Gerth v. Warden, Allen Oakwood Corr. Inst.*, 938 F.3d 821, 826 (6th Cir. 2019). Further, a federal court may not consider a habeas petition unless a State prisoner has presented his claim to the State courts in accordance with the State's procedural rules. *See Shinn v. Ramirez*, 596 U.S. 366, 371 (2022).

A petitioner may procedurally default a claim by failing to raise it in State court and pursue it through the State's appellate review procedures. *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006). Where the petitioner has failed to do so, and State courts would dismiss or deny the claim on that basis, the federal court must do the same because the petitioner has procedurally defaulted the claim. *Shinn*, 596

U.S. at 371. If State law no longer allows the petitioner to raise or appeal the claim at the time of the habeas petition, the claim is procedurally defaulted. *Id.* Procedural default may be excused where a petitioner can show that an external factor prevented him from complying with the procedural rule at issue, through no fault of his own, and that the alleged constitutional violation resulted in actual prejudice. *See Coleman v. Thompson*, 501 U.S. 722, 753 (1991).

### I.A. Objection to Dismissing Ground 1

In Ground 1 of his petition, Petitioner asserts that the State appellate court erred in finding that the trial court's alleged failure to acquire a knowing, voluntary, and intelligent waiver of presence during *voir dire* was not a manifest miscarriage of justice. (ECF No. 1-2, PageID #20.) The Magistrate Judge recommends dismissing Ground 1 as procedurally defaulted because Petitioner failed to include his claim that trial counsel did not protect his right to be present for *voir dire* in his State proceedings. (ECF No. 14, PageID #1135 & #1139.) Petitioner objects, arguing that the trial court's failure to obtain adequate waiver is a plain error which affected his substantial right to be present during *voir dire*. (ECF No. 20, PageID #1171–74.) Alos, he also argues that, even without plain error, the prejudice caused by his absence overcomes the procedural default. (*Id.*, PageID #1174–75.)

Petitioner relies on Ohio's plain error standard to argue against the procedural default. (ECF No. 20, PageID #1172–73.) But Ohio appellate court here enforced that standard. (ECF No. 9-1, PageID #318–19.) It found that Petitioner did not show that he met the high bar for plain error review in the absence of a contemporaneous objection. Because the State courts enforced their procedural rules against

consideration of the merits of this claim, Petitioner has procedurally defaulted it. In any event, the record shows that defense counsel discussed individual *voir dire* with Mr. Johnson and obtained Mr. Johnson's consent before waiving his presence for him. (ECF No. 9-2, PageID #472–73.) Petitioner points to nothing in the record suggesting that he did not understand the rights being waived or how to consult with his attorney.

In his objection, Petitioner concedes that defense counsel may waive a defendant's presence on behalf of his client. (ECF No. 20, PageID #1173.) Also, he raises a new argument that the trial court should have ensured Mr. Johnson's understanding of the rights being waived and how to consult with his attorney. (*Id.*, PageID #1173–74.) Because Petitioner raises this argument for the first time in his objection, the Magistrate Judge could not have had an opportunity to address this argument, so the objection is improper. In any event, while the colloquy Petitioner suggests might be best practice, there is no reason to believe that the Constitution requires it. Therefore, the Court **OVERRULES** this objection.

### I.B. Objection to Dismissing Ground 2

In Ground 2 of his petition, Petitioner maintains that the use of an anonymous jury violated his First and Fifth Amendment rights. (ECF No. 1-2, PageID #23.) The Magistrate Judge recommends dismissing Ground 2 as procedurally defaulted. (ECF No. 14, PageID #1135–40.) Petitioner objects, arguing that the use of an anonymous jury as both a plain error and structural error which overcomes the procedural default. (ECF No. 20, PageID #1175–77.)

In his petition, Petitioner claimed that the State trial court erred by failing to provide the names or addresses of potential jurors and by allowing the jurors' appearances to be partially hidden by "the mandated use of masks during the COVID-19 pandemic." (ECF No. 1-2, PageID #23.) In the State proceedings, however, Petitioner did not object to the masking of the jury, and he did not raise that failure as part of his ineffective assistance of counsel claim on direct appeal. (*See* ECF No. 9-1, PageID #201–15; *id.*, PageID #387–89.)

Petitioner objects, arguing that the use of an anonymous jury is a structural error that excuses any procedural default. (ECF No. 20, PageID #1177.) But that objection misunderstands structural error, which avoids the need for harmless error analysis upon the finding of a constitutional violation. It does not address preservation of the issue for habeas review in the first place. On habeas review, an error may be considered harmless unless it had "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (quoting *Kotteakos* v. *United States*, 328 U.S. 750, 776 (1946)). Structural errors "by their very nature cast so much doubt on the fairness of the trial process that, as a matter of law, they can never be considered harmless." *Satterwhite v. Texas*, 486 U.S. 249, 256 (1988). But that inquiry differs from the issue of procedural default and the principles of comity and federalism it advances.

For these reasons, the Court agrees with the Magistrate Judge that Petitioner procedurally defaulted this claim. Therefore, the Court **OVERRULES** this objection.

## II. Failing to Strike a Juror

In Ground 4A of his petition, Petitioner claims that his trial counsel was deficient for failing to "strike a bias[ed] juror either by moving to strike for cause or exercising a preemptory strike against [her]." (ECF No. 1-2, PageID #27.) The Magistrate Judge recommends dismissing Ground 4A as meritless. (ECF No. 14, PageID #1154.) The Magistrate Judge thoroughly examined the transcript of *voir dire* regarding Juror 21. The Magistrate Judge found that Juror 21 "expressed sympathy for the victim, not too far from the statement of impartiality in *Miller*" *v. Webb*, 385 F.3d 666, 674 (2004)," where the prospective juror expressed sympathy for the victim, causing the Sixth Circuit to find that trial counsel's performance was deficient for failing to strike the juror. (ECF No. 14, PageID #1154.) The Magistrate Judge noted that, where such potential bias is present, "it is essential that a juror swear that she could set aside any opinion she might hold and decide the case on the evidence." (*Id*. (quoting *Patton v. Yount*, 467 U.S. 1025, 1036 (1984).)

The Magistrate Judge noted that the record shows Juror 21 was one of ten prospective jurors who indicated having previous knowledge of Mr. Johnson's case and that she expressed sympathy for the victim. (*Id*., PageID #1153.) When the State trial court asked if she is "capable of basing [her] decision solely on the evidence that [she] would hear in this courtroom and without regard to anything that [she] may have read or heard about the case," Juror 21 responded, "Yes." (ECF No. 9-2, PageID #484–85.) The Magistrate Judge noted that both the prosecutor and defense counsel asked Juror 21 "comparable questions and Juror 21 replied [that] she could follow the judge's instructions about the burden of proof and the presumption of innocence."

(ECF No. 14, PageID #1153–54; *see* ECF No. 9-2, PageID #486–88.) During group *voir dire*, Juror 21 was again asked about the burden of proof and the presumption of innocence and, as the Magistrate Judge noted, "she conveyed [that] she would apply those principles as instructed." (ECF No. 14, PageID #1154; *see* ECF No. 9-2, PageID #519 & #570.) "Because Juror 21 assured the court of her impartiality and all her later statements were consistent with that assurance," the Magistrate Judge determined that Mr. Johnson did not demonstrate that Juror 21 was actually biased against him." (ECF No. 14, PageID #1152–53.) Accordingly, the State appellate court "did not unreasonably apply *Strickland* in concluding that trial counsel's decision to leave Juror 21 on the panel was not deficient and did not prejudice Mr. Johnson." (*Id.*)

Petitioner objects, arguing that he established actual prejudice. (ECF No. 20, PageID #1177–78.) In his objection, Petitioner argues that the Magistrate Judge failed properly to analyze the Sixth Circuit's decision in *Miller*. (ECF No. 20, PageID #1178.) Arguing that "the court never asked juror 21 if she could set her opinion or impression aside," Petitioner argues that the follow up questions posed to Juror 21 insufficiently examined her partiality towards the victims. (*Id.*, PageID #1179–80.)

A showing of actual bias against a defendant to support a claim of ineffective assistance of counsel for failing to strike a juror. *See Miller*, 385 F.3d at 674. Actual bias means "'bias in fact'—the existence of a state of mind that leads to an inference that the person will not act with entire impartiality." *Hughes v. United States*, 258 F.3d 453, 456 (6th Cir. 2001). Even then, counsel or the trial court can rehabilitate

by asking the juror whether she could set aside her feelings and render a verdict based solely on the evidence. *Miller*, 385 F.3d at 675 (quoting *Irvin v. Dowd*, 366 U.S. 717, 723 (1961)).

In *Miller*, a juror expressed sympathy for the victim of the offense. Because trial counsel and the State trial court did no follow up and made no effort to rehabilitate the juror, the State trial court had an obligation to dismiss the juror, and counsel was defective for failing to raise the issue. *Id.* at 674. Here, Juror 21 affirmed on the record that she was capable of basing her decision solely on the evidence in the courtroom and setting aside any opinion that she might hold to decide the case on the evidence. (*See* ECF No. 9-2, PageID #484–85.) While trial counsel did not elicit the specific wording that Petitioner uses in his objection, trial counsel did follow up with multiple questions to evaluate the potential juror's ability to set aside any feelings of sympathy for the victim.

Accordingly, Juror 21 did not have actual bias against Mr. Johnson, and trial counsel's performance was not deficient. Therefore, the Court **OVERRULES** this objection.

## III. Ineffective Assistance and Admission of Certain Evidence at Trial

### III.A. Authentication of Phone Records

Petitioner objects to the recommendations for both Ground 4B and Ground 5 in the same section. (*See* ECF No. 20, PageID #1180–81.) However, the Court notes that Petitioner's description of Ground 4B in his objection is the same as Ground 4C in the petition and differs from the petition's description of Ground 4B. (ECF No.1- 2, PageID #30; ECF No.20, PageID #1180–81.) It appears that the misnumbering is a

typographical error because of the multiple subparts to Ground 4. Therefore, the Court uses the description of the objection instead of the numbering and reads this objection as relating to Ground 4C and Ground 5.

In Ground 5, Petitioner asserted that the State trial court erred by improperly admitting testimony concerning unauthenticated phone records. (ECF No. 1-2, PageID #34–35.) Specifically, Petitioner argued that the State trial court misinterpreted the requisite qualifications for an expert to authenticate a business record. (*Id.*) The Magistrate Judge recommends dismissing Ground 5 as not cognizable because he found no egregious State evidentiary ruling. (ECF No. 14, PageID #1119.) In Ground 4C, Petitioner asserted that his trial counsel's failure to object to the phone records and related testimony denied him the effective assistance of counsel. (ECF No. 1-2, PageID #30.) The Magistrate Judge recommends denying Ground 4C as meritless. (ECF No. 14, PageID #1155.) Petitioner objects to the Magistrate Judge's recommendations for Ground 5 and for Ground 4C together. (ECF No. 20, PageID #1181.)

In his objection regarding Ground 5, Petitioner argues that the Court "cannot defer to the [State appellate court's] ruling where such a ruling is based on misinterpretation of law and fact." (ECF No. 20, PageID #1181.) Specifically, Petitioner argues that the State appellate court "misinterpreted [Special Agent] Kunkle's testimony" by failing to recognize that the "testimony merely indicate[d] familiarity with the records themselves—not the system which creates or maintains them." (*Id.*, PageID #1183.) In his objection regarding Ground 4C, Petitioner argues

that, because the State trial court allegedly erred in admitting the records, an objection to the records from trial counsel "would not have been a 'meritless objection' and rather was necessary to protect [his] constitutional [rights]." (*Id.*)

"[I]t is not the province of a federal habeas court to reexamine state-court determinations on [S]tate-law questions." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991). A State court's evidentiary ruling must be "so egregious that it results in a denial of fundamental fairness" for habeas relief to be warranted. *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003); *see also Ege v. Yukins*, 485 F.3d 364, 375 (6th Cir. 2007). In assessing whether the admission of evidence constitutes a denial of fundamental fairness, the analysis turns on "whether the evidence is material in the sense of a crucial, highly significant factor." *Brown v. O'Dea*, 227 F.3d 642, 645 (6th Cir. 2000) (quoting *Leverett v. Spears*, 877 F.2d 921, 925 (11h Cir. 1989) (internal citations omitted)).

At issue is the State trial court's interpretation of the admissibility of Special Agent Kunkle's expert testimony and, relatedly, the authentication of the phone records based on his testimony. The Court fails to see a way to consider this objection that does not involve interpretation or application of the rules of evidence. That fact makes the claim not cognizable in habeas. Nothing about the decision of the State courts to admit the testimony of Special Agent Kunkle rises to the level of a due process violation. To the extent this objection asserts ineffective assistance of counsel based on a failure to object, the governing habeas standard requires the Court to defer to the State courts' adjudication that the cell phone records were properly admitted,

as the Magistrate Judge noted. (ECF No. 14, PageID #1146.) Therefore, the failure to object to an evidentiary decision that is presumptively correct or at least debatable falls within *Strickland*'s broad heading of trial strategy and is not deficient. For these reasons, the Court **OVERRULES** this objection.

**III.B. Prior Shooting and Gang Affiliation**

Petitioner objects to the recommendations for both Ground 4C and Ground 6 in the same section. (*See* ECF No. 20, PageID #1183.) The Court notes that Petitioner's description of Ground 4C in his objection is nearly identical to the wording of Ground 4D in the petition and differs from the petition's wording of Ground 4C. (ECF No.1-2, PageID #31; ECF No.20, PageID #1183.) As with the previous objection, the Court suspects that the misnumbering results from a typographical error because of the multiple parts to Ground 4. Therefore, the Court uses the description of the objection instead of the numbering and reads this objection as relating to Ground 4D and Ground 6.

In Ground 6, Petitioner asserted that the State trial court erred by improperly admitting testimony concerning Mr. Johnson's involvement in a prior shooting. (ECF No. 1-2, PageID #35.) The Magistrate Judge recommends dismissing Ground 6 as not cognizable because Petitioner failed to "demonstrate the [State] court's admission of evidence about [the prior shooting] resulted in a denial of fundamental fairness." (ECF No. 14, PageID #1148.) Relatedly, in Ground 4D, Petitioner asserted that his trial counsel's failure to object to his "alleged involvement in gang activity" denied him the effective assistance of counsel. (ECF No. 1-2, PageID #31.) The Magistrate Judge recommends denying Ground 4D as meritless because the State appellate court

"did not unreasonably apply *Strickland* in concluding Mr. Johnson's counsel was not deficient." (ECF No. 14, PageID #1156.) Petitioner objects to the Magistrate Judge's recommendations for Ground 6 and for Ground 4D together. (ECF No. 20, PageID #1183.)

In his objection, Petitioner argues that the Magistrate Judge misapplied Sixth Circuit precedent, mischaracterized the evidence, and failed to account for the prosecution's bolstering of witness testimony. (ECF No. 20, PageID #1184.) Petitioner argues that the testimony about the prior shooting was improperly "used to bolster the credibility" of the State's witness. (*Id.*) He argues that the testimony regarding his family member's gang affiliations "was wholly irrelevant to the ultimate facts at issue in [his] case" (*id.*) and that the testimony of the prior shooting and alleged gang involvement was "[o]verly prejudicial evidence that rendered [his] trial fundamentally unfair" because it intimated that he was a gang member and had a propensity for violence, so was more likely to have committed the murder (*id.*, PageID #1185).

Whether there has been a denial of fundamental fairness depends on the materiality of the evidence at issue. *Brown v. O'Dea*, 227 F.3d 642, 645 (6th Cir. 2000). Regarding the admission of testimony about Mr. Johnson's alleged history as a victim of a prior shooting, the Court agrees with the Magistrate Judge that the State courts' adjudication of this claim is not a determination that is contrary to or an unreasonable application of federal constitutional law. As for the relevancy of the gang affiliation, the State courts reasonably determined that the testimony provided

a motive for the shooting. Because proper grounds supported the admission of this evidence, trial counsel was not ineffective for failing to object. Therefore, the Court **OVERRULES** this objection.

### IV. Cumulative Error

In Ground 9, Petitioner asserted that the cumulative effect of multiple errors resulted in the deprivation of his constitutional rights. (ECF No. 1-2, PageID #37.) The Magistrate Judge recommends dismissing Ground 9 as not cognizable because the Sixth Circuit does not recognize cumulative error claims for habeas review. (ECF No. 14, PageID #1148–9.) Petitioner objects, arguing that the court should recognize that other circuits recognize such a claim. (ECF No. 20, PageID #1185.) Petitioner concedes that the Sixth Circuit does not recognize cumulative error as a basis for the a writ. (*Id.*)

Because the law of this Circuit does not permit the issuance of a writ based on cumulative error, *Williams v. Anderson*, 460 F.3d 789, 816 (6th Cir. 2006), the Court has no occasion to consider the objection further. Accordingly, the Magistrate Judge correctly determined that Petitioner's claim for cumulative error is not cognizable for habeas review in this Circuit. Therefore, the Court **OVERRULES** this objection.

## CERTIFICATE OF APPEALABILITY

Without a certificate of appealability, a habeas petitioner cannot appeal a final order in a habeas proceeding. 28 U.S.C. § 2253(c)(1)(A). A court may issue a certificate of appealability only if the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This means that the petitioner must show that reasonable jurists could find the district court's

determination of the relevant constitutional claims debatable or incorrect. *Tennard v. Dretke*, 542 U.S. 274, 282 (2004). The petitioner need not show that the appeal will succeed. *Miller-El v. Cockrell*, 537 U.S. 322, 337 (2003).

Based on this standard, Petitioner does not qualify for a certificate of appealability. "Where a plain procedural bar is present and the district court is correct to invoke it to dispose of the case, a reasonable jurist [cannot] conclude either that the district court erred in dismissing the petition or that the petitioner should be allowed to proceed further. In such a circumstance, no appeal would be warranted." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). None of Petitioner's other claims are fairly debatable among reasonable jurists. Because Petitioner has not made a substantial showing that he was denied any federal constitutional rights, Petitioner is not entitled to a certificate of appealability.

## CONCLUSION

For the foregoing reasons, the Court **OVERRULES** Petitioner's objections (ECF No. 20), **ADOPTS** the Magistrate Judge's report and recommendation (ECF No. 14), and **DENIES** and **DISMISSES** the petition (ECF No. 1). Further, the Court **DENIES** a certificate of appealability.

**SO ORDERED.**

Dated: September 28, 2026

J. Philip Calabrese
United States District Judge
Northern District of Ohio